Mark I. Schickman (CSB #62653)
SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708
Phone: (510) 467-2909
Email: Mark@SchickmanLaw.com

THEODORE J, BIELEN, JR. (CSB #56395)
BIELEN & LAMPE
1390 Willow Pass Road, Ste 1020
Concord, CA 94520
Telephone: (925) 288-9720
Facsimilia: (925) 288-9731
Email: bielenlt@yahoo.com

*Attorneys for Defendant and Counter-Claimants*
*O'Keeffe's, Inc., d/b/a SaftiFirst*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELY HOLDINGS LIMITED, a United Kingdom company, and GREENLITE GLASS SYSTEMS INC., a Canadian company, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| O'KEEFFE'S, INC., d/b/a SAFTIFIRST, a California corporation, | ) ) ) |
| Defendant. | ) ) ) |
| O'KEEFFE'S, INC., d/b/a SAFTIFIRST, a California corporation, | ) ) ) |
| Counter-Claimant, | ) ) ) |
| v. | ) ) |
| ELY HOLDINGS LIMITED, a United Kingdom company, and GREENLITE GLASS SYSTEMS INC., a Canadian company, | ) ) ) ) ) |
| Counter-Defendants. | ) ) |

CASE NO.  18-CV-06721-JCS

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGEMENT**

**January 22, 2021**
**The Hon. Joseph C. Spero**
**Time: 9:30 a.m.**

**(i)**   <u>**Table of Contents**</u>

I.      RESPONSE TO PLAINTIFFS' STATEMENT OF THE ISSUES....................... pg. 1

II.     STANDARD ON SUMMARY JUDGEMENT...............................................pg. 1

III.    INTRODUCTION REGARDING ISSUES 1 & 2 (INFRINGEMENT)................ pg. 2

        A.      No GPX Ever Was Offered, Sold or Made With an Air Layer.....................pg. 3

        B.      No Accused Device Was Offered For Sale To Transbay Terminal.................pg. 4

        C.      The Toggle Is Not An LTM as Defined by the Court, Because Some Load Transfers
                to (And Therefore Does Not Bypass) the Lower Floor Layers ......................pg. 5

        D.      The Structural Glass And Fire Glass Touch Each Other, And Are Not Separated From
                Each Other ...............................................................................pg. 7

        E.      SAFTI Does Not Infringe Under The Doctrine Of Equivalents ......................pg. 8

        F.      Greenlite Makes No Showing Of Willful Infringement ...............................pg. 10

        G.      The '475 Patent Is Invalid ................................................................pg. 11

IV.     Greenlite Is Not Entitled To Summary Judgement On SAFTI'S Crosscliams .......pg. 12

        A.      BUY AMERICA MISREPRESENTATIONS ......................................pg. 13

                1.      The Department of Transportation Buy America Act ..........................pg. 13

                2.      Transbay Misrepresentations ................................................pg. 14

                3.      Union Square Misrepresentations ...........................................pg. 15

        B.      Greenlite's Misrepresentations About Its Product And Company .............pg. 16

                1.      Greenlite's Misrepresentations About SAFTI ...............................pg. 16

                2.      Greenlite's Misconduct was the "but for" cause of losing at least two jobs ..pg. 17

                3.      The Conduct Above Violates the Lanham Act .................................pg. 19

                4.      Greenlite's Conduct Constitutes Unfair Competition Under California law
                        ................................................................................pg. 20

                5.      Greenlite's Interference with Contractual Relations and Prospective Advantage
                        ................................................................................ pg. 21

V.      CONCLUSION ...................................................................... pg. 23

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

**(ii)**     <u>Table of Authorities</u>

**Cases**

( Della Penna v. Toyota Motor Sales, U.S.A., Inc. , supra, 11 Cal.4th at p. 392..............26

3D Sys., 160 F.3d at 1379..........................................................................8

Abbot Laboratories v. Andrx Pharmaceuticals, 473 F.3d 1196, 1212 (Fed. Cir. 2007) ...14

<u>Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997)</u>........................................6

Alpo Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 964 (D.C. Cir. 1990)..............24

Amsted Indus. Inc. v. Buckeye Steel Castings Co.,24 F.3d 178, 181 (Fed. Cir. 1994)....14

Asia Vital Components v. Asetek Danmark A/S, 377 F. Supp. 3d 990, 1005 (N.D. Cal. 2019) 13

Augustine Medical, Inc. v. Gaymar Indus., Inc., 181 F.3d 1291, 1304 (Fed. Cir. 1999)....7

<u>Carlson v. FedEx Ground Package Sys., Inc., 787 F.3d 1313, 1317 (11th Cir.2015)</u>.........6

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)........................................6

Chavez v. Whirlpool Corporation, 93 Cal.App.4th 363, 374; (2001).............................25

Committee on Children's Television v. General Foods Corp.,35 Cal.3d 197, 209-210, 197 Cal.Rptr. 783, 673 P.2d 660 (1983).........................................................25

Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Servs., Inc., 911 F.2d 242, 244 (9th Cir. 1990) ..........................................................................................24

Della Penna v. Toyota Motor Sales, U.S.A., Inc., supra, 11 Cal.4th at page 392.............26

Dmuchowsky v. Sky Chefs, Inc., No. 17-cv-05521-JCS, at *6 (N.D. Cal. Nov. 9, 2018) .6

Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 149 F.3d 1309, 1317 (Fed. Cir. 1998)14

Farmers Insurance Exchange v. Superior Court,2 Cal.4th 377, 383, (1992)...................25

Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki, 535 U.S. 722, 736 (2002) .............13

Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003)..............................................6

General Elec. Co. v. Nintendo Co., Ltd., 179 F.3d 1350, 1359 (Fed. Cir. 1999) .............13

Google LLC v. Pers. Audio, LLC, 2017-1162, at *12 (Fed. Cir. Aug. 1, 2018)..............12

Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1048 (Fed. Cir. 2001)..............8

In re Kelley, 305 F. 2d 909, 915-16 (CCPA 1962) ........................................12

Lamothe v. Atlantic Recording Corp., 847 F.2d 1403, 1405-06 (9th Cir. 1988) .............24

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

Lantech, Inc. v. Keip Mach. Co., 32 F.3d 542, 547 (Fed. Cir. 1994) ...............................7

LiMandri v. Judkins, supra, 52 Cal.App.4th at p. 343 ....................................................26

McKesson Information Solutions, Inc. v. Bridge Med., Inc. No. Civ S-02-2669 FCD KJM (E.D. Cal. Sep. 23, 2005) .............................................................................................8

MEMC Elec. Materials, Inc., 420 F.3d 1369 at 1376 ......................................................8

MEMC, 420 F.3d at 1376 ...................................................................................................8

Monolithic Power Systems, Inc. v. O2 Micro International Ltd., 476 F. Supp. 2d 1143, 1151-52 (N.D. Cal. 2007) .............................................................................................13

Nazomi Commc'ns, Inc. v. Nokia Corp., No. C-10-04686 RMW, at *9 (N.D. Cal. June 18, 2013) .........................................................................................................................14

Pacific Gas Electric Co. v. Bear Stearns Co. (1990)......................................................26

Premier Tech. Sales v. Digital Equipt., 11 F. Supp. 2d 1156, 1167 (N.D. Cal. 1998)......25

Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd., 599 F.3d 1308, 1316 (Fed.Cir.2010).... 7

Quelimane v. Stewart Title Guaranty, 19 Cal.4th 26, 55-56 (1998) ...............................27

Rice v. Fox Broad. Co., 330 F.3d 1170, 1181 (9th Cir. 2003) .........................................24

Rogers v. Grua, 215 Cal.App.2d 1, 9 (Cal. Ct. App. 1963)..............................................26

Rossetta v. CitiMortgage, Inc., 18 Cal.App.5th 628 (Cal. Ct. App. 2017).......................25

Rotec Indus., 215 F.3d 1246 at 1257 (Fed. Cir. 2000) .....................................................8

SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1347 (Fed. Cir. 2001) ....................................................................................................................14

Shaolian v. Safeco Insurance Company, 71 Cal.App.4th 268, 275 (1999) .....................25

Spotless Enters., Inc. v. Carlisle Plastics, Inc.,56 F.Supp.2d 274, 278 (E.D.N.Y.1999) ..24

Steele v. Bulova Watch Co.,344 U.S. 280, 283–84, 73 S.Ct. 252, 97 L.Ed. 319 (1952)..24

Stoiber v. Honeychuck,101 Cal.App.3d 903, 927, 162 Cal.Rptr. 194 (1980)..................25

T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) .... 6

T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) ..............................................................................................................6

Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d 1084, 1090-92 (Fed. Cir. 1998)14

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT**

**Statutes**

18 U.S.C. 1001 ................................................................................................................. 18

35 U.S.C. § 271(a) ............................................................................................................. 7

35 USC Section 271(a) ....................................................................................................... 7

49 CFR 661. 6 ................................................................................................................... 18

49 CFR 661.15 ................................................................................................................. 18

49 CFR 661.17 ................................................................................................................. 18

49 CFR Part 661 ............................................................................................................... 17

49 CFR Part 661.7 ............................................................................................................ 18

49 U.S.C 24405 ............................................................................................................... 17

49 U.S.C, Section 5323 (j) ............................................................................................... 17

50 Cal.3d 1118, 1126.) ................................................................................................... 26

Cal. Bus. Prof. Code § 17200 .......................................................................................... 25

Cal. Bus. Prof. Code § 17200.) ........................................................................................ 25

California Unfair Practices Act ("UPA"), California Business and Professions Code § 17200, et

    seq ................................................................................................................................. 25

Lanham Act § 43(a) .......................................................................................................... 24

Lanham Act 15 USC  section 1051 et. seq ......................................................................... 5

Manville v. Countrywide Financial Corporation, 2:08-cv-1931-GEB-DAD, at *17 (E.D. Cal. Oct.

    8, 2008) ........................................................................................................................ 25

**Rules**

Fed.R.Civ.P. 56(c). ............................................................................................................ 6

**Treatises**

Restatement (Second) of Contracts §§ 26 (1981) ............................................................. 8

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

## I.    RESPONSE TO PLAINTIFFS' STATEMENT OF THE ISSUES

(1) There has been no infringement because SAFTI never offered for sale, sold or promoted a glass floor system containing a sealed airspace. Prior to Plaintiffs' 2018 cease and desist letter, SAFTI was never warned by anybody that its product "likely infringed the'475 patent"

(2) SAFTI's product, comprised solely of glass and intumescent material, does not infringe the patent; it is one unit, comprised of nine layers of alternating glass and intumescent material with no gap or separation between "structural glass" and "fire rated glass", the structural and fire retardant layers touching each other and some constant and applied load of the top layer transferring to the lower layers.

(3) Clear and convincing proof shows the'475 patent is invalid, being anticipated by prior art depicted in figures 1 of the'475 patent, and obvious from prior art.

(4) SAFTI presented proof allowing a finding that Greenlite caused damage to SAFTI, including the loss of at least two specific jobs, as Greenlite (A) violated the Lanham Act 15 USC  section 1051 et. seq., (B) engaged in unfair competition and (3) intentionally interfered with Safti's contracts and prospective advantage by conduct including: falsely representing that SAFTI was dishonest and had no listing, certification, or floor system available for sale; misrepresenting the origin of its goods and its business, and; in bad faith (without any basis) telling building professionals SAFTI violated its patent and stole its product.

## II.    STANDARD ON SUMMARY JUDGMENT

Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party moving for summary judgment must show the absence of a genuine issue of material fact to prevail. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a

genuine issue for trial." Id. A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). On summary judgment, all reasonable inferences must be drawn in favor of the non-moving party. Id.

Evidence to support or oppose a motion for summary judgment need not be in a form that would be admissible at trial, but the contents of the parties' evidence must be amenable to presentation in an admissible form. See Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003);  Dmuchowsky v. Sky Chefs, Inc., No. 17-cv-05521-JCS, at *6 (N.D. Cal. Nov. 9, 2018) On summary judgment the Court does not make credibility determinations or weigh conflicting evidence with respect to a material fact. T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987);  Carlson v. FedEx Ground Package Sys., Inc., 787 F.3d 1313, 1317 (11th Cir.2015). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Id. at 1318 (quoting Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997)). Though they need not do so in all cases, courts can engage in "a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd., 599 F.3d 1308, 1316 (Fed.Cir.2010).

Proving literal infringement under 35 U.S.C. § 271(a) requires proof by a preponderance of evidence that each and every limitation of a patent claim is present in the product accused of infringing. See Augustine Medical, Inc. v. Gaymar Indus., Inc., 181 F.3d 1291, 1304 (Fed. Cir. 1999); Lantech, Inc. v. Keip Mach. Co., 32 F.3d 542, 547 (Fed. Cir. 1994).

## III.   INTRODUCTION REGARDING ISSUES 1 AND 2 (INFRINGEMENT)

As explained SAFTI'S Motion for Partial Summary Judgment filed on November 24, 2020 (Docket 189-1), the undisputed material facts show that SAFTI'S 120 GPX floor does not infringe.  To say the least, there are material issues of fact which preclude plaintiffs' instant motion for judgment that infringement did occur.

There is no embodiment of a SAFTI floor with an air layer, disposing of plaintiffs' issue (1).  The phrase on a prior data sheet referring to an air layer does not constitute a sale, as a

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

matter of law.  Regarding plaintiffs issue (2) , the unitized floor that SAFTI does sell plainly

does not infringe, as it is so different from the patented device -- as the confluence of the

Markman rulings recognizes (Dkts 112, 142 ). Finally, Plaintiffs proof of "willfulness" is

nothing but a brazen misrepresentation of the gossamer thin record to which Plaintiffs site.

### A.  No GPX 120 Ever Was Offered, Sold or Made With an Air layer

No safety GPX floor with an air layer was ever certified or sold or drawn for any

customer or potential customer.  (Dkt 189-3, Para 9). Plaintiffs have never seen one built or

drawn (Dkt 189-4, 152 of 396, 110:10-16). Plaintiff's sole basis to claim an embodiment with

an air layer is to a mistaken phrase in a superseded SAFTI marketing brochure[1],  an error

removed from the website and never sold or offered.  (Supp. Schickman Dec., Exh 1, O'Keeffe

Deposition, July 7, 2020,113:12-114:16; 117:15-118:21).

Moreover, that brochure cannot be considered an offer for sale under 35 USC Section

271(a). The Federal Circuit has "defined liability for an `offer to sell' under section 271(a)

`according to the norms of traditional contractual analysis;'" under this framework, in order for

there to be an "offer for sale," the alleged infringer "must communicate a manifestation of

willingness to enter into a bargain, so made as to justify another person in understanding that

his assent to that bargain is invited and will conclude it." MEMC Elec. Materials, Inc., 420 F.3d

1369 at 1376 (quoting Rotec Indus., 215 F.3d 1246 at 1257 (Fed. Cir. 2000) (quoting

Restatement (Second) of Contracts § 24 (1979)) (quotation marks and alteration marks

omitted). "McKesson Information Solutions, Inc. v. Bridge Med., Inc. No. Civ S-02-2669 FCD

KJM (E.D. Cal. Sep. 23, 2005.  Attendance at a trade show and displaying a prototype does

not, alone, constitute an offer for sale under Section 271(a). See MEMC, 420 F.3d at 1376; 3D

Sys., 160 F.3d at 1379. A data  "brochure is, thus, more analogous to an advertisement than an

offer, serving to prompt consumers to seek out additional information on the product. See

Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1048 (Fed. Cir. 2001), citing

Restatement (Second) of Contracts §§ 26 (1981) ("[C]ontract law traditionally recognizes that

---

[1] Plaintiffs argue that SAFTI still maintains that data sheet on its web site, but that reference is to a superseded data sheet in a third party ad purchased by SAFTI (Supp. Schickman Dec. Exh 2, 280:15-23).  SAFTI is unable to make changes within that third party promotion piece (Id., 282:7-283:12; 278:8-279:3).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1    mere advertising and promoting of a product may be nothing more than an invitation for offers,

2    while responding to such an invitation may itself be an offer.")

3         The record shows that the parties' floors are sold after a lengthy bid and design process

4    with design professional purchasers.  A purchaser does not and could not buy a floor on the

5    basis of that data sheet, so it is not an offer for sale under section 271(a).  That data sheet phrase

6    is the *only* alleged support for Plaintiffs' claim that SAFTI sold a floor with an air layer; not

7    only *could* a jury disregard that brochure in the face of the conflicting evidence, it *must* do so.

8         But, assuming *arguendo* that data sheet constituted a SAFTI offer to sell a floor with an

9    air layer (and it is not), so what?  Plaintiffs did not patent the air.  SAFTI may (though it never

10   has) make a floor with an air layer, and without a toggle.  SAFTI has never sold or designed or

11   made a floor with an air layer, and one cannot assume it would build it in an infringing manner.

12        Mr. O'Keeffe denies the existence of any offer or sale of a GPX 120 floor with an air

13   layer, and nobody has ever seen one.    The assertion that such an embodiment exists is made of

14   whole cloth. A phrase in a  marketing statement, erroneous or not, cannot constitute one as a

15   matter of law; but even if it did, that marketing statement says nothing about an infringing load

16   transferring means and -- -- without that -- -- had SAFTI offered a floor with an air layer, no

17   infringement is shown. Plaintiffs are not entitled to summary judgement that SAFTI made or

18   sold a floor with an air layer, or that any such floor violated the '475 Patent'.

19   **B.  No Accused Device Was Offered For Sale To Transbay Terminal**

20        SAFTI does not dispute that it sold its unitized floor with a toggle mechanism to the

21   Union Square and the 1050 17th street projects.  However, there is no evidence that it offered a

22   product with a toggle to the Transbay Terminal project.  As  Mr. O'Keefe declared (Dkt 189-3,

23   Para 4), he had not come up with the idea for the adjustment toggle at the time of the Transbay

24   discussions, and the evidence does not only put that at issue, it establishes it in Safti's favor.

25        As the only Support for his report's opinion that SAFTI offered a toggle to Transbay,

26   Mr. Macfarlane made general reference to an administrative ruling, under appeal (Dkt 189-6,

27   149 of 201, para. 98) (subject to a companion motion to strike); pressed for any actual evidence,

28   Plaintiffs now come up with one single last piece of proof (Supp. Schickman Dec. Exh 5,

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

258:7-259:6): not a bid document, or submittal for the project, but rather Exhibit D to the Griffiths declaration: a February 19, 2015 e-mail from Griffiths to Transbay, attaching an internal July 2, 2014 fire test reports which, Griffiths writes, "convinced us that formal full scale testing will be successful… with Intertek testing services. (Bautista Declaration, Exh 8, Exhibit D, filed under seal)." That July 2014 test report was not presented as product for sale, but on its face only to show that Safti was actively testing and believed that it will successfully pass an Intertek test.

The floor drawn for that Intertek test is in evidence at Dkt 189-5, 5-7 of 132, and does not include a toggle (Docket 189-3, Paragraph 5; Dkt 189-4, 60 of 396, Paragraph 37). Similarly, the drawing actually sent to Transbay in connection with the project does not contain a load transferring means (Dkt. 189-5, 45-46 of 132). Indeed, no floor design in evidence looks anything like the drawing of that test sample (Bautista Declaration, Exh 8, Exhibit C , page 3 , filed under seal ) which: has five layers of intumescent material, not four; has seven layers of glass, not five; includes 1/8 inch thick glass inside the intumescent layers, not quarter inch glass , and a wholly different top support structure. Mr. Macfarlane has never seen Safti or anyone else sell a floor configured like that test subject ( Dkt 189-4, Exh 4,  258:22-259:6;260:11-261:23; 274:7-12) That this floor was tested in July 2014 is not probative of what was offered for sale to Transbay nine months later, and cannot arguably support summary judgment that a floor with a toggle was offered for sale to the Transbay Terminal project  (plaintiffs present none!).  There is not a shred of evidence showing an accused device being offered to Transbay.

**C. The Toggle Is Not An LTM as Defined by the Court, Because Some Load Transfers Through (And Therefore Does Not Bypass) the Lower Floor Layers**

Contrary to plaintiffs' assertion (Dkt.  187, 13:25-26), SAFTI denies that its "toggle" is a load transferring means ("LTM") , as the term is well defined by the court (Dkt. 112, 19-21). As the court held, the LTM's, in combination, must transfer <u>all</u> load from the upper glass directly to the structural frame, bypassing the lower glass (Id., Issues B, D, H).  Dr. Stevick proved that, even with the toggles fully engaged, some load from the top of the GPX 120 passes through the lower fire glass layers before passing to the structural frame.  The toggles do not

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1  transfer all of that load, bypassing the lower floor, and therefore are not LTMs as used in the

2  patent, as defined by the court.

3      Notably, Mr. Macfarlane agrees that, even with the toggles fully applied, load applied to

4  the top " engages" with the lower layers before it goes "back up through the toggle to the

5  structural frame" [2](Docket, 189-4, Exhibit 4, 230:8-233:5).  Mr Rae, the inventor of the'475

6  patent, agrees as well (Docket 189-1, 14:12-26).

7      Though Messrs.  Macfarlane, Rae, and Stevick agree with this basic point of physics, by

8  twisted logic alone Plaintiffs' brief attacks Dr. Stevick's opinion that load transfers from the

9  upper layer of the GPX 120 to the lower layers (Docket 187, 15: 3 - 12).  They argue that the

10  GPX test failure after 81 minutes without a toggle, and success for 120 minutes with a toggle;

11  "can only be attributed a toggle mechanism transferring all of that applied load directly from the

12  structural layer to the frame." Why does that follow? It is a non-sequitur.

13      First, why can't the floor survive for 120 minutes with some of the 100 pounds per

14  square foot load still passing through the fire floor? Secondly, the 120 minute test floor has butt

15  joints in the center loaded to 100 PSF with no toggles beneath them.  Where is the proof that

16  *none* of the load applied to butt joints transfers through the lower  levels; where else can it go?

17      Plaintiffs' logic chain also wrongly assumes that the only material change in the two test

18  floors was the toggle.  Not so.  The UL test subject was 5 3/16 inches thick while the Intertek

19  test floor was 4 3/16 inches this and it was this an extra inch of intumescent material which, Dr.

20  Stevick opined, was the pertinent factor in the longer rating (Accompanying declaration of Dr.

21  Glen Stevick , paragraph  11; Dkt. 189-4, 71 of 398, Paragraph 72; compare Dkt 189-5 , 29 of

22  132 and 88 of 132) .  That point aside, nothing in the two tests remotely suggests -that all of the

23  load applied to the top of the toggled floor bypasses the fire floor. Plaintiff's specious reasoning

24  has no support in fact or logic; all of the evidence proves that some load passes through and

25  does not bypass the lower floor layers.

26

27  [2] Plaintiffs now complain that Dr. Stevick's test of the floor load as faulty because it was performed in a non

28  fire state.  Is undisputed that the floor deflects during a fire, and that deflection must cause an increase in load
   (Dkt. 189:1, 15:7-17).  Thus, Dr. Stevick's analysis about load transfer is all the more true during a fire.

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

1    Both experts and the inventor agree that, with the toggles engaged, during a fire or not,

2    load from the upper layer engages with the lower layers and then comes back up through the

3    toggles to the structural frame (Dkt. 230:8-233:3). Plaintiffs' motion for judgment on

4    infringement must be denied, and Safti's motion for judgment on the point should be granted.

5    **D. The Structural Glass And Fire Glass Touch Each Other, And Are Not Separated**

6    **From Each Other**

7    Additionally, per the Markham rulings, the floor does not infringe because it is a single

8    unit, with the fire layers and the structural layers touching, and no space between the two layers

9    (Dkt 112, Issues A, C).   To avoid that obvious fact, Plaintiffs fancifully remove the top layer of

10   intumescent material (25% of the fire retardant material), call it an airspace and then refill it

11   with the very same intumescent material which it removed (Docket 187, 13:15-17; 14:15-18).

12   That intumescent material is an integral part of the fire floor, and not a random additive. As Mr.

13   Macfarlane admits, the  UL and Intertek fire ratings, integral to the court's definition of a fire

14   rated glass (Docket 142, 4:18) requires all four layers of intumescent material, and all five

15   layers of glass which surround it  (Dkt 189-5, Exh 4, 243:24-244:17).  Each of the floor's four

16   layers of intumescent material and each of the five layers of glass are part of the fire rated glass[3]

17   The record is replete with references to how a GPX 120 unit burns during a fire,

18   including charts for SAFTI's 2015 81 minute test from Intertek (Supp. Schickman Dec., Exh 3),

19   and its 2017 120 minute test from UL (Dkt 189-5, 90-132),  the former test without a toggle and

20   the latter with a toggle.  The glass layers exposed to fire quickly crack, and the adjacent

21   intumescent layer foams, swells and burns slowly to protect the layers above (Docket 189-6,

22   page 104 paragraph 50).  Eventually, that intumescent layer burns away, exposing the next glass

23   layer to crack, and the process repeats itself.  The charts reflecting the chronological activity

24

25

---

26   [3] In this unitized floor, in which the intumescent material must be bonded to glass on both sides to operate,  the
top walking layer serves as both structural layer and the top of the fire glass (Supp. Schickman dec. Exh 4,

27   124:7-125:16, 155:2-156:17, 164:2-25).  "A  single  element, feature,   or mechanism can ordinarily satisfy
multiple claim limitations, including by performing  multiple  claimed functions"  Google LLC v. Pers. Audio,

28   LLC, 2017-1162, at *12 (Fed. Cir. Aug. 1, 2018)"[A] particular means may perform more than one function.");
In re Kelley, 305 F. 2d 909, 915-16 (CCPA 1962) ."

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1  throughout the duration of each test shows that the glass cracks and falls away quickly, while the

2  intumescent material provides the great length of the fire protection (Dkt 189-5, 97-98).

3     Each fire test in evidence tests the floor as a single unit, and the certifying agencies list

4  the floor as a single unit (Dkt 189-5, Exh 15,21,22,23).  The patent term "fire rated" is properly

5  defined as requiring certification by a testing authority (Dkt. 142, 4-18).  Each of the five layers

6  of glass and each of the four layers of intumescent material in the GPX 120 is an inherent part

7  of the 120 minute fire rated glass; a GPX 120 does not fall within term (ii) (d) of this court's

8  January 31, 2020 order (Docket 142, 4:18) if one removes 25% of the products' major fire

9  retardant, or the top glass sheet to which that layer of intumescent material adheres. As

10  construed in Docket 142, a GPX 120 is nothing but structural glass and fire rated glass bonded

11  together, each layer touching the next.  In a single bonded unit it has a laminated walking

12  surface and fire retardant glass certified by national testing agency, composed of alternating

13  layers glass and intumescent material, with glass on both exteriors. The structural layer and the

14  fire retardant intumescent material touch each other, have no space or gap between each other,

15  and transfer load from top to bottom. The GPX 120 does not infringe.

16     **E.  SAFTI Does Not Infringe Under The Doctrine Of Equivalents**

17     In his September 11, 2020 expert report, and in his deposition , Mr. Macfarlane presented

18  the "doctrine of equivalents" <u>only</u> to opine that SAFTI infringed dependent claim 11 ; that was

19  the sum of his opinion on the topic. (Docket 189-6, 91-93 of 201; Supp. Schickman Dec., Exh

20  5, 324:18-325:7).  In his November 2, 2021 rebuttal, he raises a new sweeping theory that, if

21  SAFTI does not literally infringe the patent because some load transfers from the top of the

22  floor  to the lower levels, that difference is insignificant and that <u>all</u> claims are infringed on the

23  basis of the doctrine of equivalents.  That broad-brush  "conclusory assertion of equivalence" is

24  "insufficient to establish a genuine issue of material fact" and to carry Plaintiffs' burden.

25  General Elec. Co. v. Nintendo Co., Ltd., 179 F.3d 1350, 1359 (Fed. Cir. 1999). MOREOVER,

26  that late change is prejudicial; the opinion should have been disclosed 14 days after the initial

27  Case Management conference in Plaintiffs' Notice of Infringement Claims under Patent Local

28  Rule 3.1(e) (it was not) ,  and as part of Mr. Macfarlane's initial infringement report on

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

September 11, 2020 (it was not) , and should not be permitted now. Asia Vital Components v. Asetek Danmark A/S, 377 F. Supp. 3d 990, 1005 (N.D. Cal. 2019).

Secondly, Greenlite is estopped from this end run around the limitation it was forced to place in the'475 patent in order to get it approved.  As explained in the prosecution history analysis in Dkt 92, 3:12-5:15, ,  after multiple rejections of the patent, and in order to avoid the teaching of the bonded laminated unit in the Roberts patent, Rae added the limitation that the load had to bypass the lower layer, and go directly  to the structural frame.  He may not now ignore that limitation as insignificant.  "Under prosecution history estoppel, where an amendment is made to secure a patent and the amendment narrows the scope of the patent, a presumption arises that infringement under the doctrine of equivalents is no longer available for the amended element". Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki, 535 U.S. 722, 736 (2002). Monolithic Power Systems, Inc. v. O2 Micro International Ltd., 476 F. Supp. 2d 1143, 1151-52 (N.D. Cal. 2007).

A claim limitation requires that NO load pass to the lower floor. Under the "all elements rule" a patentee may not use the doctrine of equivalents when its application would "vitiate a claim limitation." Abbot Laboratories v. Andrx Pharmaceuticals, 473 F.3d 1196, 1212 (Fed. Cir. 2007). A subject matter cannot be included within the scope of a patent under the doctrine of equivalents if it is inconsistent with the language of the claim. See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1347 (Fed. Cir. 2001); Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 149 F.3d 1309, 1317 (Fed. Cir. 1998); see also Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d 1084, 1090-92 (Fed. Cir. 1998)   move Nazomi Commc'ns, Inc. v. Nokia Corp., No. C-10-04686 RMW, at *9 (N.D. Cal. June 18, 2013)

Finally, the difference between separated floor which transfers no load and a connected floor which transfers some load is far from insubstantial.  The concept of "no load" characterizes separated floors which do not touch.  It is a limitation of Claim 1.

Plaintiffs recognize the important difference between how the system operates depending upon whether it has an air layer, or is simply glass and intumescent material.  The air layer, say plaintiffs, is necessary to maintain proper thermal levels between the floors, (Dkt.  189-6, 84 of

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

201).  Greenlite floors always have an air layer, as it sells its VDS floor has an air layer of about 12 inches (Supp. Schickman Dec. Exh 6), and its XT floor an air layer of about 12 mm (Supp. Schickman Dec. Exh 7).  In fact, Greenlite repeatedly (and erroneously) maintains that SAFTI cannot make its floor without an air layer separating the walking surface from the fire rated glass.  (Supp. Schickman Dec. Exh 14, 15). Thus the air layer and the intumescent layer act differently; they are not equivalent.

Assuming that plaintiffs are permitted to broaden their argument under the doctrine of equivalents so greatly at the 11th hour, they still have no basis to support it.

### F.  Greenlite Makes No Showing of Willful Infringement

To establish willfulness, Plaintiffs must prove by clear and convincing evidence that, in view of the totality of the circumstances, SAFTI acted in disregard of the '475 patent at the time it infringed or continued to infringe, and that it lacked a reasonable basis for believing that it has a right to do what it did. Amsted Indus. Inc. v. Buckeye Steel Castings Co.,24 F.3d 178, 181 (Fed. Cir. 1994). Greenlite meets no burden, let alone clear and convincing proof. There is no genuine evidence of willfulness

Admittedly, SAFTI received plaintiffs March 2018 cease and desist letter.  In defense of any charge of willfulness thereafter, SAFTI relies upon the advice letter of counsel Theodore Bielen, advising at length that no infringement was occurring (Supp. Schickman Dec., Exh 13).

But Plaintiffs' repeated assertion that Griffiths warned SAFTI in 2015 (or ever) that it was "likely infringing" is the opposite of what he wrote.  As entire willfulness argument rests on that major mischaracterization, it must fail.

Griffith Exhibit E is  the alleged warning message actually sent to Mr. O'Keefe on August 28, 2015[4] when the two "discussed what could be construed to be a load transferring means"-- -- discussing the design of the fire floor which is expressly still a work in process[5]. Mr. Griffith writes: (Griffiths Dec Exh E)

---

[4] The email was written in 2015, not  2014, as GREENLITE represents at Dkt 187, 6:18-20 .

[5] As if more proof were needed, this e-mail further disproves a green lights manufactured "fact" that the toggle was offered for sale to Transbay terminal in or before March 2015 (Dkt. 187, 6:10-12).  That toggle was just being discussed at the end of August 2015.

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1    I believe that by joining the walkable unit to the FRG [fire rated glass] unit and

2    filling the gap that's also referred to in the patent claims, we are circumventing

3    the noted design parameters. However, an expert opinion would be helpful

4  From that e-mail alone, GREENLITE fictionalizes that Griffiths "warned SAFTI that

5  the floor likely infringed the'475 patent (Dkt 187 1:24-26; 21:4-6) and that by August

6  2015 "SAFTI knew there was a high likelihood that the accused products infringed" the

7  475 patent  (ID 6:20-24; 21:17).  Of course, Griffiths is actually writes that he does ***not***

8  think design was infringing, but Greenlite shamelessly distorts the evidence.

9    **G. The '475 Patent Is Invalid[6]**

10    Safti concedes its heavy burden of clear and convincing proof in support of its

11  invalidity argument. Dr. Stevick made plain in his report (and his deposition) that each

12  element and limitation in Claim 1 is found in Fig 1 of the '475 patent, and a POSA

13  would find that each such element and limitation is anticipated by Fig 1.

14    Plaintiffs also attack Dr. Stevick's definition of obviousness, but Mr. Macfarlane

15  summed up in agreement with Dr. Stevick's concept: "Even if a claimed product or

16  method is not explicitly described in its entirety in a single prior art reference, the patent

17  claim will still be denied if the claim would have been obvious to a POSA at the time of

18  the patent application filing," (Supp. Schickman Dec. Exh 5, 321:1-15).

19    Plaintiffs next argue that Fig 1 does not depict BOTH the load transferring

20  means AND the structural frame.  But as Dr. Stevick notes, a POSA would understand

21  that the floor has to connect to a structural frame, as it does not hamg in the air (Supp.

22  Schickman Dec. Exh 4 86:20-87:20, Dkt 189:4 Exh 3 paragraph 20). Mr. Macfarlane

23  agreed to that concept, too, when explaining why the patent in suit did not have to

24  describe its frame for a POSA to know it was there: "Although Rae does not expressly

25  disclose a foundation, a person of ordinary skill in the relevant art would understand that

26  the flooring system disclosed by Rae is intended to and would be used with a foundation

---

27  [6] As Plaintiffs note, Safti only addresses the validity of the claims Safti is accused of infringing, and not the
28  rest; they are not at issue. Greenlite's may not seek a judgment on the merits that those unlitigated claims are
valid

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1   or the like. That is, one skilled in the art would recognize that Rae's flooring system is

2   not intended to be used on its own, but rather would be installed in a building or similar

3   structure, i.e., a foundation." (Supp. Schickman Dec. Exh 5  323:3-21)

4      Finally, Plaintiffs argue that Safti has not shown that anyone would have been

5   motivated to build a fire floor from the prior art; here, again, Mr. Macfarlane admits that

6   "A person of ordinary skill would have been motivated to combine teachings about

7   structural glass and fire-rated glass to develop a multilayered flooring system." (Supp.

8   Schickman Dec. Exh 5 323:22-324:1-8).

9      Greenlite is left with its final argument, that the 8" to 10" I-Beam pictured in Fig

10  1 is actually the structural frame.  First, as Dr. Stevick points out, no POSA would use a

11  lilliputian 8" to 10" beam as the structural frame;  those mini I beams are assumed to

12  connect the larger b building structure.  BUT, that point aside, from what a POSA sees

13  looking at Fig 1, each element of claim1 is both anticipated and obvious.

14     There remainder of the dependent claims are obvious manifestation, that the

15  flanges be parallel to the glass, that the web extend upwardly from the support, that the

16  LTM be of a size and shape suitable to supporting a floor. Without a valid claim 1 as a

17  base, none of dependent claims  2, ,5,6,7,8,11,13, 13 or 21 present anything novel.

## IV.   Greenlite Is Not Entitled To Summary Judgement On SAFTI'S Crosscliams

19     Greenlite engaged a years long multifaceted pattern of false representations about its

20  own business and product, and about that of SAFTI, which (1) violates the Lanham Act (2)

21  constitutes unfair competition under California's unfair competition law (Business and

22  Professions Code section 17,200 t seq) and (3) constitutes the common law torts of interference

23  with contract and interference with prospective advantage.

24     Greenlite misrepresented the origin of its product, falsely claiming it was made in

25  America.  It misrepresented its own capabilities, being a two employee company which

26  fraudulently boasted it had 50 professionals, claiming over 100 completed projects when it

27  admits that, under the most generous count, it completed less than 40. It represented into 2019

28  that it produced the only fire floor available for external use in North America, though it knew

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

SAFTI built one, as well. Greenlite also engaged in a planned attack against Safti, as well, intentionally and baselessly accusing it of dishonesty and theft, conveying threats of patent infringement to Safti's customers without any basis in fact to do so.  It also spread the false word that safti had no listing, no rating and no product to sell when that was not true.

There is more than enough evidence of wrongful conduct to permit a jury finding of Greenlite's Lanham Act violations and tortious misconduct.

## A. BUY AMERICA MISREPRESENTATIONS

### (1)    The Department of Transportation Buy America Act

The Buy America violations in which Greenlite engaged revolve centrally around two projects in San Francisco. The Transbay Terminal and the Union Square Metro extension.  Both are subject to the provisions of the United States Department of Transportation "Buy America" provisions found at 49 U.S.C, Section 5323 (j), 49 CFR Part 661, and 49 U.S.C 24405. A bidder/supplier like Greenlite has specific obligations under the Buy America Act, including the provision of a *timely* Certificate of Compliance or a Certificate of Non Compliance, in the form set forth in 49 CFR 661. 6.  If Greenlite wanted to seek a waiver of the Act's provisions, it had to apply to the FTA Administrator for one before submitting its bid (49 CFR Part 661.7).   If it learned of the need for noncompliance after being selected, it had to promptly seek a waiver from the administrator then (Id.). " A false certification is a criminal act in violation of 18 U.S.C. 1001.  (49 CFR 661.15)  "If a successful bidder or offeror fails to demonstrate that it is in compliance with its certification, it will be required to take the necessary steps in order to achieve compliance" (49 CFR 661.17)

As shown below, Greenlite won the Transbay Terminal job by falsely representing that the fire rated glass floor would be made completely in Germany  Greenlite also received the contract for the Union Square project, and attempted to use the same practice of delaying notice of non-compliance until it was too late; ultimately, after nearly a year of refusals to provide requested Buy America certifications, Greenlite was removed from the Union Square project and SAFTI was later selected.

### (2)    Transbay Misrepresentations

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

Ryan Dennett was aware of the Transbay Terminal project at least since 2008 (Supp. Schickman Dec. Exh 8 67:12-26). By March 15, 2011, Vetrotech told Dennett and Michael Rae that American sourcing of material will be an issue with Transbay, which Rae dismissed saying "architects and clients talk about this, but … ultimately ignore the sources of the material" with Dennett adding "bye (sic) America" is really a farce…If it ever becomes a problem we can assemble in Canada and we ship through the NAFTA treaty"(Supp. Schickman Dec. Exh 9); Vetrotech pushed back that it is "much more than a farce when public money is concerned", and Dennett responded "trust me, we have been selling it this way for years." (Id.)

In November 2014, Dennett wrote to find a consultant to help him "trying to get away with fabricating the glass in India and the steel in Canada. "(Supp. Schickman Dec. Exh 22).

On December 17, 2014 Vetrotech again told Dennett that "we are probably not able to manufacture this at our factory in the U. S." (Schickman Dec. Exh 11). Nonetheless, through the beginning of March, 2015, Dennett assured project manager Jeff Heath that his product would meet the Buy America criteria (Schickman Dec. Exh 8, 98:14-100:16).

A meeting was set for March, 2015, among the Transbay Terminal contractors, Greenlite and Vetrotech's   Kirk Ratzel, who would fly in from Germany.  After years of cautions to Dennett falling on deaf ears, Ratzel wrote to project Manager Jeff Heath and architect Erik Del Angel that "we must produce at our site in Aachen, Germany.  If this a "killer criteria" we should know now,…  If not, then we can confirm our attendance." Supp. Schickman Dec. Exh, 12.  Jeff Heath then wrote to the Dennett that "you stated that you can meet the buy American (sic) requirement, I now get this e-mail…  Can you or can't you meet the buy American (sic) requirement" (Id).   Dennett contacted Ratzel immediately, who repeated "the product cannot be produced in the U.S.  (exactly as I said in my email).  I was not exaggerating or playing poker.  If this is a deal killer, then no reason to have the meeting" (Id.)  Dennett agreed with  Ratzel  that it is a deal killer, and promptly wrote falsely to Eric Del Angel on March 13 "please ignore the e-mail from Kirk…  I had a talk with him…  It will be primarily assembled and manufactured at Vetrotech at Auburn Washington, USA…  The top glass floor portion is 100% USA" (Supp. Schickman Dec. Exh 16). This was a knowing lie.

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

As of March 20, 2015, the Transbay Terminal glass floor job had come down to SAFTI and Greenlite (Supp. Schickman Dec. Exh 30). On March 26, 2015, GREENLITE was "selected to provide the design assist and execution of the supply to Crown Corr for W12 & W13 package at Transbay" (Supp. Schickman Dec. Exh 21).

On October 16, 2015, the glazing subcontractor Crown Corr wrote to Greenlite, with a set of terms and conditions which included compliance with the Buy America Act. Dennett immediately plead ignorance writing "now that you have strong Buy America language…we need to define "as defined by… 49 CFR 661…" ." Of course, Dennett had known for years what Buy America required, and the definition is not for him to negotiate (Supp. Schickman Dec. Exh 10). As Plaintiffs aver, ultimately on December 15, 2015 Dennett reported, as he knew all along, that the glass would be made in Germany. Greenlite never sought or applied for a waiver of the Act's provisions under Section 661.7 (Dennett Deposition 96:19-105:16, 122:9-20)

### (3)    Union Square Misrepresentations

The extension project of the San Francisco metro through Union Square was done for the San Francisco Metropolitan Transit Authority (SFMTA), with general contractor is Tutor Perini; the glazing contract was initially awarded to Sashco, which purchased the fire rated floor through Greenlite on April 17, 2015 (Supp. Schickman Dec. Exh 17).

On August 26, 2016, Sashco asked Mr. Dennett for certification of Buy America compliance (127,597). As he did when pressed for compliance on Transbay Dennett responded with mock surprise: "WHAT??!!! This is the first we heard of this… This is a big screw up on your part", adding to the chain the next day "where does it say "buy America"" (128,350-353) (Supp. Schickman Dec. Exh 24).

When the matter was still not resolved on November 7, 2016, the SFMTA wrote to Tutor Perini expressing the need for Buy America compliance, and the next day Tutor Perini forwarded that letter to Sashco with his own stern warning regarding Buy America compliance (Supp. Schickman Dec. Exh 23).

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

1    More than six months later, Greenlite had still not provided the Buy America

2    certification has still not come, and on May 18, 2017 Dennett wrote to Tutor Perini " there was

3    no mention of Buy America in the spec section…  and this was never mentioned to me by

4    Sashco at the time of bidding ",  with Tudor Perini responding by resending the original

5    specifications "with Buy America" . (Supp. Schickman Dec. Exh 18 50,305-50,308).  By July

6    2027, Tutor Perini replaced Sashco and Greenlite on the project, and put it out for rebid , telling

7    Mr. Dennett good luck and Greenlite could submit a bid if he wanted. (Supp. Schickman Dec.

8    Exh 19)

9    **B.  Greenlite's Misrepresentations About Its Product And Company**

10    At no time in its 15 year history has Greenlite ever employed more than two people

11    (Supp. Schickman Dec. Exh 8, 19:20-20:9;  23:21-26:9).  Nonetheless, it falsely advertises that

12    it has over  50 professionals (Id., 158:19-159:23; Supp. Schickman Dec. Exh 28).  Taking into

13    account every floor Greenlite has ever been associated with, it has built fewer than 40 floors

14    (Supp. Schickman Dec. Exh 8 154:20-157:6) but  Greenlite advertises and tells customers that it

15    has completed over 100 projects (Id., Exh 12).  Well into 2019 It advertises that it makes the

16    only floor available in North America for exterior use (Id., 199:20-200:13;203:12-15), ignoring

17    its knowledge that SAFTI manufactures such a floor.

18    GREENLITE repeatedly misrepresented the origin of its goods, as shown above.  In

19    March, 2015, I to obtain the Transbay terminal job, Dennett intentionally misrepresented to

20    Transbay that its glass floor would be made in America, even after Vetrotach repeatedly told,

21    and reiterated to Dennett that it could not be made in the United States.

22    **(1)   Greenlite's Misrepresentations About SAFTI**

23    GREENLITE also spread damaging lies about SAFTI.  Greenlite contacted numerous

24    construction professionals, falsely stating that SAFTI has no listing,  rating or fire floor to

25    professionals including: telling Gensler and associates architects and Barr and Barr contractors

26    on September 24, 2015  that SAFTI did not have a 60 minute floor listing (Intertek provided

27    that listing in August, 2015); telling PNG architect Mark Farrar on September, 2017 that SAFTI

28    had no under 20 minute fire listing, though Intertek provided that listing on.  In that e-mail

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

16

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

1   Dennett added that SAFTI was being sneaky in disclosing its product,  a clear and false

2   message that SAFTI's product representations are not be trusted.

3        In those emails Dennett added the bad faith representation SAFTI had copied the

4   Greenlite System, and was infringing on Greenlite's patent.  Prior to October 24, 2017, Dennett

5   and Rae had "never seen a single detail" of the SAFTI firefloor, and "only then… identified a

6   possible infringement of the '475 patent" (Supp. Schickman Dec. Exh 29,  Supp. Schickman

7   Dec. Exh 8 90:23-95:5).  That did  not stop Dennett from telling design professionals for years

8   beforehand of that potential infringement.

9        On May 18 2017, in an effort to "scare off SAFTI again", Dennett wrote to the project

10  engineer for the Willis  Tower Project in Chicago saying SAFTI "copied our patented floor

11  system"  representing that SAFTI does not have a "legitimate test/listing" but only "an

12  engineering evaluation from a test lab." (Supp. Schickman Dec. Exh 25).  Again, on May 18,

13  2017, Dennett wrote to the Willis Tower engineer, claiming falsely that "SAFTI copied our first

14  generation 'separate sheet' system" and is in danger of engaging in patent infringement (ID.)

15  As Mr. Rae clearly explained, he and Dennett knew nothing to suggest patent infringement to

16  them until October 17, 2017, but Dennett accused SAFTI of theft and spread the threat of an

17  infringement claim in the industry anyway.

18       **(2)    Greenlite's Misconduct as the "but for" cause of losing two jobs**

19       Plaintiffs argue that, even if they committed misconduct, safety cannot prove any lost

20  jobs as a result of it.  Quite to the contrary, facts exist to allow a jury to draw that inference.

21  SAFTI  has clearly shown a likelihood of  injury from Greenlite's misconduct, notwithstanding

22  Greenliter's assertion SAFTI has no proof from which a jury could find that GREENLITE's

23  Lanham act violations and torts were the "but for" cause for the loss of at least two jobs.

24       As of March 20, 2015, SAFTI and Greenlite were the only two companies in contention

25  for the Transbay Terminal project (Supp. Schickman Dec, Exh 20); had Greenlite been honest

26  about its inability to meet Buy America requirements, a jury can certainly infer that SAFTI

27  would have been selected.

28

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

In Response, GREENLITE argues SAFTI would not have gotten the Transbay job because it had not done a fire floor as of March 2015, and had no certified product to sell.  But the same was true of Greenlite in March, 2015, as Transbay was its first XT 120 project, and it would not receive a certification for that floor until April 2016.  (Supp. Schickman Dec. Exh 8 39:2-6, 116:9-17, 117:6-13, 118:14-25).  If that was not a disqualifying event for Greenlite, a jury could decide it would not disqualify SAFTI either.

As to 20 Washington Street, SAFTI was already in contract to perform the job when Greenlite's lies about its listing  and attacks on his honesty, induced the architect to abruptly disapprove SAFTI's design.  The fact that SAFTI was already in contract on the project creates enough of an inference for a jury to decide that SAFTI would have remained so but for Greenlite's brutal lies.

SAFTI was already awarded the 60 minute glass floor job at 20 Washington Street at Princeton University when Dennett reached out on September 24, 2015 and  urged the project architect to disapprove SAFTI's design. (Supp Schickman Dec.26) "SaftiFirst have been trying to copy our Glass Floor system for a while now. We have not seen their details yet because they are trying to be sneaky…. But I have to point out that if the Safti details look anything like our details they will be in US patent violation. …From what I can find on UL and Intertek directories do not have a listing or a fire test for a horizontal glass floor."  (Supp Schickman Dec.26).

Greenlite's brief falsely represents (without any evidence) that its statement is true, and that SAFTI did not have a 60 minute tested and rated floor creates when made to Mr. Jaffar this statement  (Dkt 187, 24:12-17).  Not so.  The "Original Test Issue Date" for Intertek's 60 minute rated  GPX floor, was August 27, 2015 (Dkt. 189-5, 85 of 132)

Dennett's September 24, 2015 lie about SAFTI's certification was crucial, as   this misrepresentation actually deceived the architect in a material manner; as Mr. Jaffar responded "Based on your e-mail below, it seems like SaftiFirst DOES NOT have a tested assembly". Causation is also clear, as on September 24, 2015  SAFTI's submission was rejected by Mr.

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1   Jaffar and on October 12, 2015 , Greenlite was given the job, after it reminded the architect that

2   "SAFTI pulled a fast one" to nearly get the job (Supp. Schickman Dec. Exh 27).

3   **(3)    The Conduct Above Violates the Lanham Act**

4          The above false representations violate the Lanham Act. The elements of a Lanham Act

5   § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a

6   commercial advertisement about its own or another's product; (2) the statement actually

7   deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception

8   is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its

9   false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be

10  injured as a result of the false statement, either by direct diversion of sales from itself to

11  defendant or by a lessening of the goodwill associated with its products. Cook, Perkiss and

12  Liehe, Inc. v. Northern Cal. Collection Servs., Inc., 911 F.2d 242, 244 (9th Cir. 1990); accord

13  Alpo Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 964 (D.C. Cir. 1990).

14         Federal unfair competition claims under Lanham Act § 43(a) can be based on false

15  advertising or false designation of origin. See Lamothe v. Atlantic Recording Corp., 847 F.2d

16  1403, 1405-06 (9th Cir. 1988) (stating that § 43(a) prohibits "false advertising about the goods

17  or services of the advertiser" and "selling a good or service of one person's creation under the

18  name or mark of another"). Regarding false advertising, "[r]epresentations constitute

19  commercial advertising or promotion under the Lanham Act if they are 1) commercial speech;

20  2) by a defendant who is in commercial competition with plaintiff; 3) for the purpose of

21  influencing consumers to buy defendant's goods or services." See Rice v. Fox Broad. Co., 330

22  F.3d 1170, 1181 (9th Cir. 2003).

23         Bad faith accusations of patent infringement  also violate the Lanham Act, as the Court

24  wrote in  Spotless Enters., Inc. v. Carlisle Plastics, Inc.,56 F.Supp.2d 274, 278 (E.D.N.Y.1999) :

25         "It seems clear that, if made, Spotless' false claims and implications that

26         Carlisle's hangers infringe Spotless' patent and, thus, may subject purchasers to

27         suit, or other problems, are as harmful to fair competition and as material to a

28         decision to purchase as [similar and valid] claims [arising in the false

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

comparative advertising context].") . Moreover, a statement made by one competitor to another competitor's customers about the latter's products being sold nationwide occurs within interstate commerce. See Steele v. Bulova Watch Co.,344 U.S. 280, 283–84, 73 S.Ct. 252, 97 L.Ed. 319 (1952) (explaining that the Lanham Act's interstate commerce requirement means "all commerce which may lawfully be regulated by Congress"(citations, internal quote marks omitted).

**(4)      Greenlite's Conduct Constitutes Unfair Competition Under California Law**

California Unfair Practices Act ("UPA"), California Business and Professions Code § 17200, et seq., codifies California public policy against unfair competition, and "prohibits wrongful business conduct in whatever context such activity might occur." Stoiber v. Honeychuck,101 Cal.App.3d 903, 927, 162 Cal.Rptr. 194 (1980); see also Committee on Children's Television v. General Foods Corp.,35 Cal.3d 197, 209-210, 197 Cal.Rptr. 783, 673 P.2d 660 (1983). Unfair competition is defined broadly as any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. Prof. Code § 17200. California's unfair competition law is intentionally broad, designed to encompass any activity which is EITHER unlawful OR unfair OR fraudulent. Manville v. Countrywide Financial Corporation, 2:08-cv-1931-GEB-DAD, at *17 (E.D. Cal. Oct. 8, 2008)

An action based on § 17200 to redress an unlawful business practice essentially "borrows" violations of other laws and treats them as independently actionable.  Shaolian v. Safeco Insurance Company, 71 Cal.App.4th 268, 275 (1999) ; Farmers Insurance Exchange v. Superior Court,2 Cal.4th 377, 383, (1992).  Premier Tech. Sales v. Digital Equipt., 11 F. Supp. 2d 1156, 1167 (N.D. Cal. 1998).   No unlawful act is required to constitute unfair competition, which is statutorily defined as any 'unlawful, unfair or fraudulent business act or practice.' (Cal. Bus. Prof. Code § 17200.) Chavez v. Whirlpool Corporation, 93 Cal.App.4th 363, 374; (2001); Rossetta v. CitiMortgage, Inc., 18 Cal.App.5th 628 (Cal. Ct. App. 2017).

Here, the UPL is implicated by Greenlite lying to increase the size of its workforce 25 fold, by lying about the origin of its goods,   by falsely stating that SAFTI had no listing or product when it did, and by accusing SAFTI of stealing its product and infringing on its patent

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1   when it had no good faith basis to make either charge. As Dennett admits that the breadth of its

2   experience is an important factor in its selection for projects (Supp. Schickman Dec, Exh 8

3   9:24-120: 7;153:5-16)),boasting falsely of over 100 completed jobs can also constitute an

4   actionable misrepresentation.

5        GREENLITE also violated the UPL when it violated the Buy America Act, knowingly

6   making the false representation that its glass would be made in America, and repeatedly failing

7   to file the certifications of compliance or noncompliance required by the Buy America Act.

8   Violation of the Lanham Act is also a statutory touchstone for unfair competition.

9       **(5)**     **Greenlite's Interference with Contractual Relations and Prospective**

10              **Advantage**[7]

11       "The elements which a plaintiff must plead to state the cause of action for intentional

12   interference with contractual relations are (1) a valid contract between plaintiff and a third

13   party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to

14   induce a breach of disruption of the contractual relationship; (4) actual breach or disruption of

15   the contractual relationship; and (5) resulting damage." ( Pacific Gas Electric Co. v. Bear

16   Stearns Co. (1990) 50 Cal.3d 1118, 1126.)

17       Because interference with an existing contract receives greater solicitude than does

18   interference with prospective economic advantage ( Della Penna v. Toyota Motor Sales, U.S.A.,

19   Inc. , supra, 11 Cal.4th at p. 392), it is not necessary that Greenlite's conduct be wrongful apart

20   from the interference with the contract itself. ( LiMandri v. Judkins, supra, 52 Cal.App.4th at p.

21   343.) Rogers v. Grua, 215 Cal.App.2d 1, 9 (Cal. Ct. App. 1963) ("It is settled that interference

22   with a contractual relationship, either by unlawful means or by lawful means which are

23   unjustifiable, is actionable, and that it may be the basis for the recovery of civil damages.")

24       As we explained in Della Penna v. Toyota Motor Sales, U.S.A., Inc., supra, 11

25       Cal.4th at page 392, it is the exchange of promises which cements an economic

26

27   [7] As shown by Dkt 187:20, SAfti has advised Greenlite that , based on the discover in this case, it intends to move to amend its pleading to assert intentional interference with contract and prospective advantage, based on the same set of facts  set forth its unfair competition and Lanham Act claims.  In the absence of prejudice to Greenlite and in the interest of justice, such an amendment is freely given under Rule 15 (a).

28

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1   relationship as a contract is worthy of protection from a stranger to the contract.

2   Intentionally inducing or causing a breach of an existing contract is therefore a

3   wrong in and of itself. …. Implicit in the Della Penna holding is a conclusion

4   that [unlawfulness] is not an element of the tort of intentional interference with

5   an existing contract.

6          Moreover, the tort of intentional interference with performance of a

7   contract does not require that the actor's primary purpose be disruption of the

8   contract. As explained in comment j. to section 766 of the Restatement Second

9   of Torts: "The rule stated in this Section is applicable if the actor acts for the

10  primary purpose of interfering with the performance of the contract, and also if

11  he desires to interfere, even though he acts for some other purpose in addition.

12  The rule is broader, however, in its application than to cases in which the

13  defendant has acted with this purpose or desire. It applies also to intentional

14  interference, as that term is defined in § 8A, in which the actor does not act for

15  the purpose of interfering with the contract or desire it but knows that the

16  interference is certain or substantially certain to occur as a result of his action.

17  The rule applies, in other words, to an interference that is incidental to the actor's

18  independent purpose and desire but known to him to be a necessary consequence

19  of his action. Quelimane v. Stewart Title Guaranty, 19 Cal.4th 26, 55-56 (1998)

20          Dennett's September 24, 2015 letters to the 20 Washington Street contractor and

21  architect fulfill all of the requirements for intentional interference with contract.  The letter to

22  Mr. Jaffar acknowledges that the glazing subcontractor had awarded the contract to SAFTI.

23  Dennett's letter expressly seeks SAFTI's removal from the project, which immediately

24  happened, yielding a loss of the sale for SAFTI.  While unnecessary to the tort of intentional

25  interference with contract, Greenlite accomplished SAFTI's removal by describing SAFTI as a

26  dishonest company, and by falsely representing that SAFTI had neither a listing nor a floor to

27  sell.  A claim of intentional interference with contract is clearly stated

28

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

Regarding both the 20 Washington and the Transbay Terminal projects, Safti also states a claim for intentional interference with prospective advantage.  SAFTI had already been selected for the 20 Washington Street project, and was one of two companies making the final cut for the Transbay Terminal project.

Unlike intentional interference with contract, this tort requires some improper conduct on Greenlite's part, and it has been shown.  For Transbay, Greenlite made the material knowing falsehood that it would supply glass for the project manufactured in the United States.  For 20 Washington street, GREENLITE made the material falsehoods that SAFTI stole its design and infringed upon its patent (though it had no idea what SAFTI's design looked like at the time) and that SAFTI did not have a listing from Intertek for a 60 minute floor. After Vetrotech directly wrote to the Transbay officials warning them that U.S. manufacture of the glass was impossible, and after Vetrotech reconfirmed that fact with Mr. Dennett in a private e-mail, Dennett again lied to the decision makers, falsely representing that after speaking with Ratzel they could ignore his prior e-mail, as the glass would be made in the United States.  For seven months after it earned the contract,  Greenlite hid that  knowledge, knowing that a major construction project had critical path deadlines and  it would became difficult or impossible to change floor design as time went on, not disclosing the true source of origin until the end of December.  Greenlite lied in March to get the job; the fact that it was forced to come clean in December does not erase eight months of knowing, false, material misrepresentations to induce the contract. These facts create inference which would allow a jury to find that Greenlite falsely advertised its product and capabilities, engaged in unfair competition and intentionally interfered with SAFTI's contracts and prospective advantage. As SAFTI was already in contract on 20 Washington and was one of two finalists on Transbay, a jury could certainly find it likely that Greenlite's misconduct caused damage to SAFTI.

## V.   Conclusion

Safti prays Greenlite's motion be denied in its entirety and that Safti's motion be granted.

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1    The unitized Safti GPX 120 is a definitively different floor than the Greenlite XT.  Only

2    by denying what a fire rated floor is, and by denying the very concept of separation, can

3    Greenlite claim otherwise.  To get their patent, Plaintiffs had to forswear  a bonded unit like the

4    GPX 120.  Under the terms of the patent and the Markman rulings,  Safti  does not infringe the

5    '475 patent al all; there is certainly no willful infringement of this patent, which is invalid and

6    anticipated and obvious in any event.

7        Secondly, Greenlite has engaged in false representations about the origin of its product,

8    the size and experience of its company, and the integrity of its competitor -- -- while accusing

9    safety of stealing its designs and infringing its patent.  It  snatched away a contract that safety

10   has received by knowingly lying about Safti's certification and rating and ability to provide a

11   floor.  Greenlite proudly violates the Buy America Act. A jury can find wrongdoing, and

12   damage to Safti.

13       For all of these reasons, Plaintiffs' motion should be denied in its entirety.

14

15                                          Respectfully submitted,
                                           SCHICKMAN LAW
16                                          BIELEN & LAMPE

17

18   Dated: December 14, 2020               By /s/ *Mark I. Schickman*
                                           Attorneys for Defendant
19

20

21

22

23

24

25

26

27

28

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT**

## CERTIFICATE OF SERVICE

I hereby certify that after midnight on December 14, 2020, I electronically filed the foregoing document with the United States District Court for the Northern District of California by using the CM/ECF system.  I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Guy W. Chambers
Ellen P. Liu
Sideman & Bancroft LLP
One Embarcadero Center, 22nd Floor
San Francisco, CA 94111-3711

Donald R. McPhail
Taft, Stettinius & Hollister LLP
111 East Wacker Drive, Suite 2800
Chicago, IL 60601

Ryan O. White
Elizabeth Shuster
Taft, Stettinius & Hollister LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204

*Attorneys for Plaintiff*


 */s/ Mark I. Schickman*
Mark I. Schickman

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT**

**SCHICKMAN LAW**
1019 Euclid Ave.
Berkeley, CA 94708