Mark I. Schickman (CSB #62653)
SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708
Phone: (510) 467-2909
Email: Mark@SchickmanLaw.com

THEODORE J, BIELEN, JR. (CSB #56395)
BIELEN & LAMPE
1390 Willow Pass Road, Ste 1020
Concord, CA 94520
Telephone: (925) 288-9720
Facsimilia: (925) 288-9731
Email: bielenlt@yahoo.com

*Attorneys for Defendant and Counter-Claimants*
*O'Keeffe's, Inc., d/b/a SaftiFirst*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ELY HOLDINGS LIMITED, a United Kingdom company, and GREENLITE GLASS SYSTEMS INC., a Canadian company, <br><br> Plaintiffs, <br><br> v. <br><br> O'KEEFFE'S, INC., d/b/a SAFTIFIRST, a California corporation, <br><br> Defendant. <br> _____ <br> O'KEEFFE'S, INC., d/b/a SAFTIFIRST, a California corporation, <br><br> Counter-Claimant, <br><br> v. <br><br> ELY HOLDINGS LIMITED, a United Kingdom company, and GREENLITE GLASS SYSTEMS INC., a Canadian company, <br><br> Counter-Defendants. | CASE NO.  18-CV-06721-JCS <br><br> **JANUARY 29, 2021** <br> **THE HON. JOSEPH C. SPERO** <br> **TIME: 9:30 A.M.** <br><br> **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SAFTI'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1

i.      Table of Contents

2

3   I.      THE UNDISPUTED FACTS REQUIRE A FINDING OF NON-INFRINGEMENT

4   ……………………………………………………………………………………..…..1

5   II.     UNDISPUTED MATERIAL FACTS REGARDING INFRINGEMENT ………….…2

6    A.  The Alleged Infringing Device and Product …………....……………..…..…………2

7   III.    THE MANY REASONS THE GPX 120 DOES NOT INFRINGE …………………….3

8          A.  The GPX 120 Is Not Separate Layers ………………………………….………3

9          B.  The GPX 120 Is Nothing but Structural Glass and FRG Which Touch Each

10             Other, With No Space or Separation Between Them……………………………4

11         C.  Each Layer of the GPX 120 is Necessary for its 120-minute Fire Rating……….4

12         D.  Locking Toggle Mechanism Exists in Space Outside of The Glass Layers …….6

13         E.  Load Transfers from The Upper Layer to the Bottom Layers, and Does Not

14             Bypass Them or Go Directly to the Structural Frame …………………..………7

15             1.  Plaintiffs finally admit that load from the top surface transfers to the lower

16             layer …………………………………………………………………………….7

17             2.  Plaintiffs may not claim that a passthrough is the same as a bypass ….……8

18             3.  Load transfers as long as the FRG is there …………………………………9

19         F.  The Prosecution History Estops Plaintiffs from Asserting the Doctrine of

20             Equivalents …………………………………………………………….……....9

21   IV.   FIG 1 ANTICIPATES AND MAKES THE PATENT OBVIOUS TO A POSA ...…10

22   V.    THERE IS NO EVIDENCE SHOWING THAT A LOCKING TOGGLE MECHANISM

23         WAS EVER SHOWN TO TRANSBAY …………………..…………………………12

24   VI.   CONCLUSION …………………………………………………………..14

25

26

27

28

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

ii.    <u>Table of Authorities</u>

**Cases**

B/E Aerospace, Inc. v. C&D Zodiac, Inc., 962 F.3d 1373, 1380 (Fed. Cir. 2020)........... 11

Cohesive v. Water Corp., 543 F. 3d 1351 (Fed Cir 2008) ................................................ 12

Creative Internet Advertising Corp. v. Yahoo!, Inc., 476 F. App'x 724 (Fed. Cir. 2011) 10

Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki, 535 U.S. 722, 736 (2002).............. 10

Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966) ...................................................... 10

KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 416, (2007)................................................. 11

Monolithic Power Systems, Inc. v. O2 Micro International Ltd., 476 F. Supp. 2d 1143, 1151-52

(N.D. Cal. 2007).......................................................................................................... 10

Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) ........... 10

**Statutes**

35 U.S.C. § 103 (a) .......................................................................................................... 11

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1  **I.      THE UNDISPUTED FACTS REQUIRE A FINDING OF NON-INFRINGEMENT**

2      From the material undisputed facts, several independent factors prevent any finding that

3  the GPX 120 fire floor ("GPX 120") infringed the '475 patent; a finding adverse to Plaintiffs

4  on any one of several issues precludes liability.  Plaintiffs have abandoned their failed theory

5  that load does not transfer from the top to the lower layers of the fire rated glass ("FRG"), relying

6  now on (1) an impossible construction of a "bypass" and "direct transfer", (2) a definition of a

7  FRG which excludes the intumescent material central to the fire protection and listing and

8  (3) resort to the structural frame instead of an air layer between the glass layers themselves.

9      The undisputed facts force plaintiffs to retreat to the untenable characterizations that:

10  1.  the intumescent material is not part of the FRG and, therefore, the structural glass and

11      FRG don't touch because the intumescent material is merely "filler" in between.

12  2.  air around the locking toggle mechanism, outside of the sealed fire rated glazing, is

13      actually an air layer separating the structural glass from the FRG.

14  3.  load transferred from the structural layer to the FRG, then "back up" through the toggle

15      to the frame, goes directly from structural glass layer to the frame, bypassing the FRG,

16  4.  the load from the top "bypasses" the FRG -- -- once the FRG burns way.

17      Preliminarily, the GPX 120 is not two floor layers at all, but a single, unitized FRG, rated for

18  120 minutes under 100 PSF of active load.  That should end the inquiry, as the '475 patent

19  describes two layers separated by a load transferring means (LTM) (Dkt. 115-2, 8:40-44, 50-53).

20  As this Court noted, the specifications "distinguish the '475 patent from an existing system in

21  which the structural and fire-rated layers were directly bonded together and the bottom fire-rated

22  layer carried the full load of the floor" (Dkt 112, 2:5-7).  The corollaries to the GPX 120's bonded,

23  unitized structure takes it out of the scope and limitations of the '475 patent.

24      A.      The two separated layers must be "separated by one or more of the load

25          transferring means, such that the structural glass does not touch the fire-rated glass". (Dkt

26          112, 19:3-6). To avoid this, Plaintiffs falsely claim that the FRG is only the tempered

27          glass, and not the intumescent material adhering to it.  The facts do not allow ignoring as

28          superfluous 25% of the FRG's primary fire retardant.

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1

B.    Alone or in combination, the LTMs must transfer "all load from the structural glass layer directly to the structural frame below, such that no load from the structural glass is transmitted to the fire-rated glass" (Dkt 112, 19:7-15).   Conceding that some load from the structural glass transmits to the FRG, Plaintiffs now claim infringement occurs because (1) load bounces back up through the toggles to the frame, or/alternatively (2) once the FRG burns away, no load can transfer to it. Plaintiffs describe neither a bypass, nor load transferred from the LTM directly to the frame; nor is there any evidence the entire FRG burns away, or any logic in interpreting the patent to mean that load must "bypass" the FRG after it burns away – by that point load transfer is a non issue.

C.    If the FRG is suspended from the structural layer, there must be "a distance of … more than 0 mm between the lowermost surface of the structural glass and the uppermost surface of the fire-rated glass, with air filling some portion of the space between the structural glass and the fire-rated glass (Dkt 112, 19:6-24)."   To create that distance Plaintiffs again pretend the intumescent material is not part of the FRG and ignore it; they then find "air filling some portion of the space between the structural glass and the fire-rated glass" outside the sealed glass floor, on the frame.

For many independent reasons the undisputed material facts show no patent infringement.

## II.    UNDISPUTED MATERIAL FACTS REGARDING INFRINGEMENT

### A.    The Alleged Infringing Device and Product

The alleged infringing product is only the 120-minute GPX floor **with** the locking toggle mechanism, and there is no claim that the GPX floor **without** that mechanism infringes on the patent (Dkt 189-4, Exh 4, 286:6-287:19; 302:11-19, 303:13-18) The alleged load transferring means (LTM) is the locking mechanism comprised of a steel toggle plate, an Allen bolt and Nylock nut (Dkt. 189-6, Exh 30, Paragraphs 60, 61, 73-77 (111-120 of 201).  Plaintiffs admit that the locking toggle mechanism is not a contributor to the fire performance of the GPX 120, but rather a form of support (Dkt. 189-4, Exh 4, 48:17-49:20; 211:21-213:14).

Whether or not it has the locking toggle mechanism/alleged LTM, the GPX 120 is always made of nine total layers, five layers of glass with four identical 5/8-inch layers of intumescent

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

material sandwiched in between; the bottom four layers of glass are each ¼ inch tempered glass, the top layer comprised of three sheets of nominal ½ inch tempered glass laminated to each other creating a nominal 1½ inch top layer (Dkt. 189-3, Par. 9; Dkt 189-4, Exh 2, Par.  17e, 44i)).

The GPX 120 is so pictured consistently, for example as presented in  Mr. Macfarlane's September 11, 2020 Opening Report (Declaration of Phillip Bautista,  Exh 4,  filed under seal November 23, 2020,) as:Exhibit O, the May 31, 2017 UL GPX 120 minute test report, at Drawings 3-5 of 14  (UL0023-0026) ;  Exhibit FF, the floor sold to 1050  17th Street in Washington, D. C.; Exhibit GG, shop drawings for Union Square in San Francisco ( pages OKI- 011282- 011286) and HH,  shop drawings for Union Square Phase II (pages OKI- 010971-010975). The same nine-layer configuration of the GPX 120 is found in: UL's GPX 120 listing (Dkt. 189-5, Exh 14, at pages 23-26 of 132); Intertek's 120-minute test report (Dkt 189-6, Exh 23, 26 of 201) and Intertek's GPX 120 listing (Dkt 189-5, Exh 16, pages 28-31 of 132), and shop drawings for floors without toggles sold to 78 Irving Street (Dkt. 189-4, Exh. 8, 307-309 of 396) and to Dream Charter (Dkt. 189-5, Exh 17, p 57-59 of 132) and drawn for U.C. Davis (Dkt. 189-4, Exh. 10, 336-339 of 396). In every case, each of the nine layers of the GPX120 is glass or intumescent material, operating in conjunction with and adhering to the adjacent layers, each intumescent material layer identical to the others, performing the same function in the same manner, integral to the fire rated glass floor system. "(Dkt. 189-4, Exh 2, Par. 17(e), 49-54; Dkt. 189-3, Par 9-10). There is never an air layer in any GPX 120 presented for sale, sold or tested and plaintiffs have never seen one (Dkt. 189-4. Exh 2, Par. 17(g); Exh. 4, 110:13-16, 134:8-11; Dkt. 189-3, Para 9)

## III.   THE MANY REASONS THE GPX 120 DOES NOT INFRINGE

### A.  The GPX 120 Is Not Two Separate Layers of Floor

The GPX 120 is not two separated layers. It is the equivalent of prior art Figure 2 of the '475 patent, a bonded unit from which the '475 patent expressly distinguishes itself.   It has a 120-minute listing as a whole; remove any sub-part within it and it has no listing or rating (Dkt 189-4, Exh 4, 76:5-20 81:11-82:16, 88:3- 13; 243:24-244:17).  It is both FRG and walking surface, with all of its structural properties (Dkt. 189-4, Exh 2, paragraphs 29-33, 49-54, pages 58-59, 66-67 of 396).  The walking surface serves as the necessary glass top of the FRG, protected

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1    by, adhering to and keeping in place the intumescent material (Dkt. 189-4, Exh.4, 297:13-299:20).

2    It is separated only by itself, meaning there is no separation within it at all (Dkt. 112, 8:15-17).

**B.   The GPX 120 Is Nothing but Structural Glass and FRG Which Touch Each Other,**
3

**With No Space or Separation Between Them**
4

5            The GPX floor is not separated by any LTM, as required in claim 1.  Without more, it

6    does not infringe upon the '475 patent.  This court has held that the separation need not necessarily

7    be air, but (anticipating plaintiffs' argument here) it cannot be separated by the structural glass or

8    FRG itself.   But that is all that the GPX 120 is made of, nothing more. The court found that

9    "separated" means that the two layers do not touch each other; the space "cannot be filled by

10   structural glass or fire rated glass" (Docket 112, 8:7-17).   It defined the FRG as two or more

11   layers of glass, with intumescent material in between and glass on both ends, rated for fire

12   resistance by a testing authority. (Dkt 142, 4:10-18)

13           The GPX 120 is exactly that FRG as defined by the court, nine alternating layers of glass

14   and intumescent material, rated by testing agencies for 120 minutes, with glass at each outer layer.

15   Because it is a single unitized body, the walking layer of glass is the glass atop the FRG.

16           As the Court ordered in Dkt 142, and as Mr. Macfarlane explained, the FRG needs glass

17   at both ends: "If it wasn't connected to anything, … it wouldn't be able to expand and insulate in

18   the way that it needs to, you know. It needs to be stuck to something so that it can expand and

19   insulate and still be stuck, otherwise I think it will fall away" (Dkt. 189-4, Exh. 4, 297:13-299:20).

20           Recognizing the Order that the two layers cannot be separated by itself, Plaintiffs claim a

21   separation where none exists, sucking out the top layer of intumescent material from within the

22   GPX 120 and calling that a 5/8-inch separation between the floor layers—serendipitously refilled

23   with the exact same intumescent material.  For several reasons, that nonsensical suggestion cannot

24   be accepted.

**C.   Each Layer of the GPX 120 is Necessary for its 120-minute fire rating**
25

26           Mr. Macfarlane agrees that if any of the nine layers of the GPX 120 were removed, it

27   would no longer have its 120-minute rating (Dkt 189-4, Exh 4, 76:5-20 81:11-82:16, 88:3- 13;

28   243:24-244:17).  In a fire, the intumescent material "expands to form a partially insulating heat

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1   shield", and the fire rating depends on the number of layers in the FRG (Dkt 189-6, Exh 30, Para

2   46, 102 of 201). Thus, under term (ii)(d) of the Further Claim Construction Order (Dkt 142), each

3   of those layers must be part of the FRG.

4        Plaintiffs argue that the top layer of intumescent material separates the structural layer

5   from the FRG and is simply a "filler" of intumescent material (Docket 192: 4:7-5:10); by the

6   same rationale they argue that the structural glass and FRG do not touch each other (Dkt. 92,

7   19:15-11:20).  To eliminate the intumescent material from the 120-minute FRG, they wrongly

8   posit that the unit does not need all four layers of intumescent material to maintain its 120-minute

9   rating (192, 5:11-6: 23). Plaintiffs point to a purportedly identical vertical window product which

10  is rated for 120 minutes with only four layers of glass and three of intumescent material (Dkt.

11  192, 5:13-6:22) thereby suggesting that the GPX 120 floor does not need all four intumescent

12  layers[1]. Of course, the argument is incompetent and, parenthetically, factually wrong.

13       Compare any data sheet for a GPX 120 floor (e.g., Bautista Dec. Exh 4 filed under seal

14  November 23, 2020, Exhibit AA) and the supposedly identical wall unit (Dkt 192-2).  The floor

15  unit is rated for 120 minutes *under a load of 100 pounds psf*, while the wall unit is not rated for

16  load – a major difference.  Not surprisingly, the two floors are not identical -- -- the 120-minute

17  floor unit is identified as 5 3/16 inches thick, the wall unit identified is on its face as 2 ½ inches

18  thick, while the bottom four panes of glass and bottom three chambers of intumescent material

19  on the floor panel measures 2 7/8 inches thick ((4 X ¼") + (3 X 5/8")).  The floor unit is tested

20  with fire burning beneath it, under a horizontal face; a wall unit is tested vertically with a fire

21  burning next to it.  Plaintiffs clutch at imaginary straws to suggest that the two ratings are

22  identical.

23       But the dispositive point is that certifications and listings are given by Intertek and UL,

24  and not by the plaintiffs; plaintiffs' opinion about whether the 2 ½ inch thick 120-minute wall

25  unit is equally rated to a 5 3/16 inch thick 120-minute load bearing floor is as irrelevant as it is

26  erroneous.

27

28
_____
[1] Ironically, Plaintiffs claim the Intertek 120-minute listing and certification silently requires a locking toggle
mechanism when none is mentioned in the listing but can dispense with 25% of the listed fire retardant.

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

Listing aside, each layer of intumescent material is necessary for 120 minutes of fire protection. In a fire, the intumescent material "expands to form a partially insulating heat shield", and the fire rating depends on the number of layers in the FRG (Dkt 189-6, Exh 30, Para 46, 102 of 201). The 2015 Intertek test floor which failed after 81 minutes was 4 3/16 inches thick, with less intumescent material than the 5 3/16 inches version rated by UL and Intertek for 120 minutes in 2017 (Compare 189-5, Exh 14, pages 23-26, Exh. 15, pages 28-32 and Exh 21, at p 88 (of 132)). The UL and Intertek test chronology show the bulk of the fire protection comes from the intumescent material reacting during a fire (Dkt. 189-6, Exh 23, pp 16-17 of 201). Mr. Macfarlane agrees (Dkt 189-6, Exh 30, para 50, 104 of 201)), adding that the more layers in the FRG the longer the fire rating (Dkt 189-6, Exh 30, Para 46, 102 of 201; Dkt 189-4, Exh. 2, Para 44). Each layer is important for the FRG rating and for fire protection.

As the top layer of intumescent material is an integral part of the FRG and not a filler, Plaintiffs' claim evaporates. The two floor layers are not separated as there is nothing to separate them except structural glass and FRG. But even if that were not the case, no infringement occurs.

## D. The Locking Toggle Mechanism Exists in Space Outside of The Glass Layers

Even if one posits that the GPX 120 is comprised of separate layers of structural glass and FRG, clearly the FRG is suspended from and bonded to the structural layer. When dealing with a suspended floor, the court noted Plaintiffs' concession that "the language of the claim itself (Claim 21) precludes the possibility of a laminated structure by expressly requiring 'a small gap' be present between the structural glass layer and fire rated glass layer" (Dkt 112, 12:8-12). Thus, the court held that a suspended structure must have "a distance of … more than 0 mm between the lowermost surface of the structural glass and the uppermost surface of the fire-rated glass, with air filling some portion of the space between the structural glass and the fire-rated glass" (Dkt 112, Issue C). Here, there is 0 mm of space between the structural layer and the FRG. In addition, there is no air space between or within the layers of the GPX 120. Mr. Macfarlane was clear in his agreement that the GPX 120 will lose its optical clarity if any air at all were present in any chamber of intumescent material in the GPX 120 (Dkt 189-4, Exh 4, 211:24-213:9).

To avoid that fatal position, plaintiffs point to a notch outside of the sealed, rated floor

1   unit, on the frame "around the periphery of the glazing panel" (Docket 192, 8:3) where "the

2   horizontal steel plate of the toggle [is]inserted" (Id., 9: 4).  Even were Plaintiffs not reneging on

3   their concession quoted by the Court, above, all evidence rejects the argument that air outside of

4   the sealed unit is in the space "between the structural glass and the fire-rated glass"

5          The patent itself describes the LTM and the upper and lower floor layers as three separate

6   things (Dkt 115-2, 8:40-44, 50-52).  Plaintiffs recognizes that the notch for the toggle is part of

7   the "locking mechanism" and not the floor.  (Dkt 189-6, Exh 30, fn 3 and accompanying text).

8          The UL GPX 120 listing (Docket 189-5, Exh 14, pp 23-26) makes the distinction between

9   "(7) Fire Resistance Rated Glazing Materials" -the 5 3/16-inch floor with no air layer and "(11)

10  Glazing Securement", which calls out the toggle plates, Allen bolt and nylock nut -- -- sitting in

11  the air needed to manipulate them.  That Listing shows the locking toggle mechanism and the air

12  around it on the frame outside of the glazing materials, not in any space within it; there is no air

13  layer between the floor layers of the GPX 120 .

14         Again, the UL full test report distinguishes between the "locking mechanism" of the

15  toggle, nut and bolt (Docket 189-5, exhibit 22, 93 of 132) and the "glazing material" (Id., 94 of

16  132).  Only "after the installation of the glazing units" and "with the stainless steel channel in

17  place, locking mechanisms were installed" including the "toggle plate and nylock nut… threaded

18  into top holes…" (Id., 95 of 132).  As plaintiffs state, there is air in the locking mechanism on the

19  periphery of the frame, providing space for the toggles, nuts and bolts to be manipulated.  That is

20  not "air filling some portion of the space between the structural glass and the fire-rated glass". A

21  suspended unit like the GPX 120 with no air layer falls outside the scope of the '475 patent.

22         The UL and Intertek engineers and Mr. Macfarlane agree that what Plaintiffs now call an

23  air space between two layers of glass is actually a securing, locking mechanism on the periphery

24  of the frame.  Importantly, it does not stop the two layers from touching each other as they must.

25  **E. Load Transfers from The Upper Layer to the Bottom Layers, and Does Not Bypass**

26     **Them or Go Directly to the Structural Frame**

27     **1. Plaintiffs finally admit that load from the top surface transfers to the lower layer**

28         Throughout this litigation, and the Macfarlane September 11, 2020 report (Dkt.189-6, Exh

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

7

30, Para 74-75 115-116 0f 201), Plaintiffs maintained that the toggle transmitted all load from the upper glass directly to the structural frame, bypassing the lower glass -- -- as required by the '475 patent, and this court's ruling that the LTM(s) transfer "all load from the structural glass directly to the structural frame below, such that no load from the structural glass transferred to the fire-rated glass".

Dr. Stevick's testimony and his FEA proved that load does transfer, even with the locking toggle mechanism fully engaged.  Mr. Rae called it a basic tenet of engineering that the open-ended toggle would have to transfer load (Dkt. 189-4, Exh. 5, 312:22-314:8, 318:15-319:8). Mr. Macfarlane now admits that load from the structural layer must transfer through the intumescent material; will "engage" the lower layer and then "go back up through the toggle to the structural frame"; this must be so, he says, "because it's bonded to the underside of the structural glass. It couldn't avoid doing so …" (Dkt 189-4, Exh 4, 164:17-169:18; 230:8-233:5; 236:6-237:15). That, too, should end the inquiry; some load transfers to, and therefore does not bypass, the FRG.

So, plaintiffs raise two new purported defenses, one directly contrary to the language of the claim terms, the other wholly unsupported speculation devoid of fact or reason.

### 2. Plaintiffs may not claim that a passthrough is the same as a bypass

Plaintiffs pivot to assert infringement because load ultimately passes through the locking toggle mechanism to the frame, after "engaging" with and coming "back up" from the FRG (Docket 192, 12:17-24, 13:6-11).  Plaintiffs attempt a sleight of hand, repeatedly misusing a phrase borrowed from the patent and order applicable to load from the upper floor, to imply a requirement that the lower floor must transfer load "directly to the structural frame below" (Docket 192, 12:19, 13:8).  The phrase "directly to the structural frame below" refers exclusively and only to load from the structural layer to the frame below it.  Plaintiff invents the proposition that load applied to the lower floor must go "directly … to the structural frame below", hoping to confuse the Court; to the contrary, according to the patent terms no load should ever get to the FRG, so the patent never considers where the load must go from there!

The patent and Order require the structural layer load to transfer directly to the structural frame bypassing the lower levels.  Those words cannot apply to load which, Mr. Macfarlane

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1  admits, "engages" the lower level and then comes "back up" through the toggles to the frame.

2  **3. Load Transfers as Long as the FRG is there**

3  There is no dispute that the floor deflects during a fire (Dkt 189-5, Exh 22, 132 of 132),

4  and load transfers during that deflection (Dkt. 189-4, Exh.4, 195:20-197:9; 200:23-203:20; 209:4-

5  10; 240:15-241:6; 242:11-20; 246:15-247:5).   Plaintiffs now posit without proof that **each** sheet

6  of glass in the FRG breaks away during a fire, leaving nothing to which load can be transferred,

7  thus creating a load bypass (Docket 192, 13:17-25).  Plaintiffs cite to two sources, Macfarlane's

8  Declaration and the UL test report (Docket 192, 13:17-20); neither source says any such thing.

9  Mr. Macfarlane never says that **each** sheet of glass breaks; to the contrary, he says that

10  the glass floor "is unlikely to be consumed by the fire evenly or uniformly…" (Docket 189-6,

11  Exhibit 30, page 105 of 201).  Nor does the UL test report show each sheet of glass breaking.

12  The first layer breaks at 3:30 into the 2-hour test (Dkt 184-5, Exh 22, Pages 97-98).  The "second

13  glass layers" had not yet broken at 1:18:00, while a layer of the southwest panel broke away at

14  1:38:00 (Id.). There is no report that any other panels break during the 120-minute test. Nothing

15  supports the suggestion that every layer of every glass panel breaks or that load is not transferred

16  to or through the remaining layers of the fire floor as fire burns for 120 minutes; it is simply

17  argument of counsel masquerading as scientific fact.

18  Aside from the vacuous factual premises of the argument, it does further violence to the

19  English language to say that load "bypasses" the lower glass after the glass has disappeared.  One

20  cannot engineer a "bypass" around something that is not there. Moreover, why would one add a

21  tautological claim that load bypasses the lower layer after that lower layer disappears?

22  Plaintiffs now admit the obvious:  load must transfer down to, and not bypass, the bonded

23  lower layers of the GPX 120, with or without the locking toggle mechanism. That fact is not

24  changed because, in some configurations, load bounces back up from the lower layers through

25  the toggle to the frame, or because load would not transfer to a lower layer after it has burned

26  away. As reasonably interpreted, the admission that load transfers to, and does not bypass the

27  lower floor layers, precludes a finding of infringement of the '475 Patent.

28  **F.  The Prosecution History Estops Plaintiffs from Asserting the Doctrine of Equivalents**

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1   Plaintiffs admittedly added the requirement that load transfer "directly to the structural

2   frame", "bypassing" the lower glass to avoid the Roberts patent; but they now argue the change

3   was only "to preclude the applied load from being transferred all the way through the fire rated

4   glass to the structural frame below" (Docket 192, 16: 12-15). But that is not what the term says,

5   and Plaintiffs' added language does not permit that argument; they again confuse a bypass with

6   a passthrough. A transfer "directly to the structural frame" denies a transfer "through the fire rated

7   glass and then back up to the structural frame"; a "bypass" denies a "passthrough."

8   To avoid continued rejection because of Roberts, Rae added the language that load from

9   the upper layer must go directly to the structural frame, bypassing the FRG; he cannot nullify the

10   agreed text by now calling the load transfer limitation immaterial.  It would be fundamentally

11   inequitable to allow Plaintiffs to obtain the patent by excluding floors whose load does not bypass

12   the lower floor or go directly to the frame, and then deny the limitation as insignificant.

13   Arguments and amendments made during patent prosecution limit and exclude interpretations

14   that were disclaimed to obtain allowance of a claim. Southwall Techs., Inc. v. Cardinal IG Co.,

15   54 F.3d 1570, 1576 (Fed. Cir. 1995); Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki, 535

16   U.S. 722, 736 (2002); Monolithic Power Systems, Inc. v. O2 Micro International Ltd., 476 F.

17   Supp. 2d 1143, 1151-52 (N.D. Cal. 2007). Nor can the doctrine of equivalents nullify a claim

18   term (Creative Internet Advertising Corp. v. Yahoo!, Inc., 476 F. App'x 724 (Fed. Cir. 2011)).

19   Finally, the uniform evidence proves that the differences in the two products are not

20   insignificant.  Plaintiffs claim that the lack of an air space harms the thermal qualities of the GPX

21   120 and make them "rubbish" (See Dkt. 189-6, Exh 29, 84 of 201; Supp. Schickman Dec Exh 31

22   (filed under seal); Dr. Stevick notes that having no air space allows the GPX 120 to transfer load

23   (Dkt. 189-4, Exh 2, Para 60, 68 of 396). The floors differ in how they operate depending on

24   whether they have load bearing material or air, so they do not perform in the same manner.

25   Plaintiffs get no relief from the doctrine of equivalents.

26   **IV.   FIG 1 ANTICIPATES AND MAKES THE PATENT OBVIOUS TO A POSA**

27   A patent is invalid "if the differences between the subject matter sought to be patented

28   and the prior art are such that the subject matter as a whole would have been obvious at the time

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

10

the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103 (a). In determining whether a patent is invalid for obviousness, a court must consider: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective indicia of non-obviousness such as commercial success, long felt but unsolved needs, and the failure of others to succeed in addressing those needs, occasionally referred to as "secondary considerations." Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966).

It would have been obvious to a POSA viewing Figure 1 that there is an upper layer of structural glass (2, 3) and a lower layer of fire glass (4, 5) separated by a load transferring means which has a horizontal portion under the upper glass (1a) and a vertical portion (1b) going to the structural frame below, bypassing the lower glass (1 c).  The structural frame is not depicted, but both experts agree that the POSA would assume that it was there (Dkt. 189-4, Exh. 4, 323:6-21; Dkt. 189-4, Exh 3, paragraphs 19-21, 110 of 396).  As a matter of common sense, Figure 1 makes obvious to a POSA the subject matter of supporting two separate floor layers by two different supports, with the load of the top layer bypassing the lower layer and being transferred directly to the structural frame.

> The Court [in KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 416 (2007)] held that "rules that deny factfinders recourse to common sense" are inconsistent with our case law. After KSR, we recognized that courts must "consider common sense, common wisdom, and common knowledge in analyzing obviousness." Arendi, 832 F.3d at 1361. B/E Aerospace, Inc. v. C&D Zodiac, Inc., 962 F.3d 1373, 1380 (Fed. Cir. 2020)

Prior art Figure 1 is clear in its teaching.  Both parties agree that a POSA would assume and understand the presence of a structural frame, rendering obvious to a POSA supporting two separated floor layers by two different support layers, with the load of the top layer going directly to the structural frame, bypassing the lower layer. Applying the relevant John Deere factors, (1) The scope and content of claim the 1 and figure 1 are the same, (2) minimal skill is required to see the obvious disclosure, (3) there is no difference between the prior art depicted in figure 1

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

and the invention in claim 1.

Finally, Plaintiffs seek to rebut obviousness and anticipation because the patent specification describes items 1a, 1b and 1c as the structural frame, and not the LTM.  But that misses the point -- -- the issue is what is obvious to a POSA, despite what Mr. Rae wrote.  An inventor might use words to describe a picture of an airplane wing as a gas tank.  it would still be obvious to a POSA as disclosing a wing.

The '475 patent admits that the Fig 1 is prior art, and it is taken for what it teaches to a POSA. If the inventor's description could contradict what was shown or implied by the teaching, he could negate the legal effect of any admission by a disclaimer saying the admitted prior art does not include his or her invention.  That disclaimer does not mask the obvious.

In the absence of anything unobvious in claim 1, the rest of the asserted claims are obvious to a POSA such as: selecting a suggested distance between floor layers (Claim 2), making the horizontal LTM parallel to the glass (Claim 6), extending the vertical LTM upward from the frame ( Claim 7), making the LTMs' horizontal section perpendicular to its vertical section (Claim 8), making the horizontal portion a metal bar (Claim 11) or metal strips (Claim 12) or making the LTM of any "size and shape" which will support the upper glass (Claims 13 and 21)

SAFTI acknowledges its burden to prove invalidity by "clear and convincing" evidence; even under that high burden, the'475 patent is invalid as obvious. Applying the somewhat overlapping concept of anticipation (Cohesive v. Water Corp., 543 F. 3d 1351 (Fed Cir 2008), the '475 patent is also anticipated because each part of Claim 1 is taught by '475 Patent, Fig 1.

## V.   THERE IS NO EVIDENCE SHOWING THAT A LOCKING TOGGLE MECHANISM WAS EVER SHOWN TO TRANSBAY

Transbay was Safti's first attempt to sell a fire floor, and Mr. O'Keeffe had not yet invented, let alone offered for sale to Transbay, a floor with the locking toggle mechanism (Dkt 189-3, Paragraph 4).  The uniform evidence agrees that no floor with a toggle mechanism was

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

12

1    offered for sale to Transbay. The February 2015 submittal SAFTI sent to Transbay has no such

2    locking toggle mechanism (Dkt. 189-5, Exh 16, 45-46 of 132). The floor that SAFTI drew for

3    Intertek's June 2015 test (immediately after the Transbay selected Greenlite on March 26, 2015

4    (Dkt. 201-10)) contained no locking toggle mechanism (Dkt 201-3, Exh 3, 29-32 of 36).   The

5    first reference to consideration of a design with a locking toggle mechanism was August 28, 2015

6    (Bautista Dec. Exh 8, Exh E, filed under seal November 23, 2020).  The October 2015 data sheet

7    on the GPX floor shows no locking toggle mechanism (Dkt 189-5, Exh 12, 17 of 32).   All

8    evidence supports Mr. O'Keeffe's declaration that no toggle was offered to Transbay.

9         On their third try, plaintiffs still present no evidence allowing an inference that SAFTI

10   offered any LTM for sale to Transbay. To support his opinion in his September 11, 2020 expert

11   declaration, Macfarlane relied only on a non final PTAB opinion which cannot be cited.[2] When

12   asked for any actual evidence at deposition, Mr. Macfarlane expressly relied solely on a drawing

13   of the test floor subject of a July 2014 internal SAFTI fire test (Bautista Dec. Exh 8, Exh C, filed

14   under seal November 23, 2020).  Recognizing that an internal test is not, and was not represented

15   to be, an offer for sale (Id., Exh D), Plaintiffs now make their third failed effort—a drawing which

16   shows a floor *without an LTM!*  Plaintiffs downplay that key absence of "a single Nylock located

17   on the Allen bolt below the horizontal steel plate" (Docket 192, 17: 23). The absence of that

18   Nylock nut is paramount. Without that Nylock nut, Plaintiffs new drawing shows only a hold

19   down which threads into the frame, not even an arguably infringing LTM.

20        As Mr. Macfarlane testified and declared, that "single Nylock nut" is a "main component"

21   of the alleged LTM (Dkt 187-6, Exh 30, paragraphs 60, 73).  Without the Nylock nut lifting up

22   and holding the steel toggle plates there is nothing allegedly taking the load. The UL listing

23   identifies that Nylock nut as a component of the Securement system (Dkt. 189-5, Exh 14)

24        There remains zero proof that SAFTI offered to sell any product with an LTM to

25   Transbay---Plaintiffs' three successive irrelevant submissions notwithstanding. All the evidence

26   _____

27   [2] In response, plaintiffs argue that the PTAB decision is final because Safti did not appeal the Transbay submittal issue.  Not true. Issue 1 on appeal is the alleged disclosure to the Webcor-Obayashi Joint Venture --

28   -- which IS the TRANSBAY project (Dkt. 192-7).  That non-final decision may not be considered as proof.

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1   shows SAFTI presenting to Transbay a floor design without the locking toggle mechanism,

2   which SAFTI had yet to invent. Had SAFTI developed the locking toggle mechanism while

3   seeking the Transbay job in February and March 2015, it certainly would have placed the

4   toggle in the proposed 120-minute floor it drew in April and May 2015 for Intertek's June

5   2015 test (indeed, plaintiffs' theory is that Safti saw the need for the toggle *because* of the 81

6   minute Intertek test in June) This Court should grant partial summary judgement that SAFTI did

7   not offer to sell any infringing device to the Transbay terminal. No evidence is presented to

8   allow a jury to reach a contrary finding.

9   **VI.   CONCLUSION**

10      The bonded, integrated, one-piece GPX 120 is not like the patented product; for several

11   independent reasons it does not infringe it.  Because it is so different from the two-layer system

12   described by the patent, one cannot even apply to it the concepts of separation and space.

13      The genuine material *facts* of this case have always been clear, leaving only a war of

14   characterizations -- -- once Plaintiffs abandoned the fiction that load does not transfer to the lower

15   levels of glass.  One cannot credibly claim that the GPX 120 is two separated layers of floor, or

16   that there is any separation between them.  One cannot credibly maintain that all four intumescent

17   layers are anything but integral parts of the FRG.  One cannot credibly suggest that load which

18   engages the lower floor layers and *then* comes back up to the toggles to the frame "bypasses" the

19   lower layer or goes "directly" from the upper layer to the structural frame.

20      Similarly, plaintiffs create out of whole cloth the notion that Safti offered a floor with the

21   locking toggle mechanism to Transbay, and present repeated false inferences to support it.

22      This infringement action was never brought or maintained in good faith, and Safti urgently

23   and respectfully prays that this court end it now and dismiss all claims of patent infringement.

24

25                                          Respectfully submitted,
                                            BIELEN AND LAMPE
                                            SCHICKMAN LAW
26

27   Dated: December 30, 2020                By *Mark I. Schickman*
                                            Attorneys for Defendant
28

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

1

2

3    **<u>CERTIFICATE OF SERVICE</u>**

4         I hereby certify that on December 30th, 2020, I electronically filed the foregoing

5    document with the United States District Court for the Northern District of California by using

6    the CM/ECF system.  I certify that the following parties or their counsel of record are registered

7    as ECF Filers and that they will be served by the CM/ECF system:

8

9                          Donald R. McPhail
                        Taft, Stettinius & Hollister LLP
10                      111 East Wacker Drive, Suite 2800
                           Chicago, IL 60601

11                         Ryan O. White
                         Elizabeth Shuster
12                      Taft, Stettinius & Hollister LLP
                        One Indiana Square, Suite 3500
13                         Indianapolis, IN 46204

14                       *Attorneys for Plaintiff*

15

16                       */s/ Mark I. Schickman*_____
                         Mark I. Schickman

17

18

19

20

21

22

23

24

25

26

27

28

SCHICKMAN LAW
1019 Euclid Ave.
Berkeley, CA 94708

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SAFTI'S MOTION FOR PARTIAL SUMMARY JUDGMENT