UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ELY HOLDINGS LIMITED, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>O'KEEFFE'S, INC.,<br><br>Defendant. | Case No.  18-cv-06721-JCS<br><br>**ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT TESTIMONY**<br><br>Re: Dkt. Nos. 185, 187, 188, 189 |

## I.     INTRODUCTION

Plaintiffs Ely Holdings Limited and Greenlite Glass Systems ("Greenlite") brought this action asserting patent infringement and related claims against Defendant O'Keeffe's, Inc. d/b/a SaftFirst ("Safti"), which in turn asserted counterclaims.  Plaintiffs' patent at issue is U.S. Patent No. 7,694,475 (the "'475 patent"), which relates to configurations of structural glass and fire rated glass in architectural flooring.  The parties compete to sell glazing for construction projects.  The parties have now each filed a motion for summary judgment and a motion to exclude expert testimony.  The Court held a hearing on January 29, 2021.  For the reasons discussed below, each party's motion for summary judgment is GRANTED in part and DENIED in part.  The Court largely does not reach the parties' motions to exclude expert testimony, and DENIES Plaintiffs' post-hearing motion to file a supplemental brief.[1]

## II.     BACKGROUND

### A.     The Parties' Claims

Plaintiffs allege, and Safti does not dispute, that Plaintiff Ely Holdings is the owner by

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court<br>Northern District of California

assignment of the '475 patent and Plaintiff Greenlite is Ely Holdings' exclusive licensee.  *See* 3d. Am. Compl. ("TAC," dkt. 162) ¶¶ 11, 13.  Plaintiffs assert claims for direct and indirect infringement of the '475 patent, *id.* ¶¶ 80–95, as well as violation of the Lanham Act and California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, the "UCL") and interference with economic advantage based on purported misrepresentations that Safti's product had been certified for 120-minute fire resistance and lacks components that, in Plaintiffs' view, infringe the '475 patent, and that Greenlite's product did not comply with "Buy America" requirements, lacked a 120-minute fire resistance certification, and was not environmentally friendly, *id.* ¶¶ 20–79, 96–118.

Safti asserts counterclaims for declaratory judgment of noninfringement, Answer to 1st. Am. Compl. & 2d Am. Counterclaim[2] (dkt. 69) ¶¶ 7–9; declaratory judgment of invalidity based on prior art acknowledged within the '475 patent, *id.* ¶¶ 10–13, and violation of the Lanham Act and UCL based on representations Greenlite made about its own products and operations and about Safti's products, *id.* ¶¶ 14–23.

### B.    The '475 Patent

To summarize at a broad level, the '475 patent describes a glass flooring system in which a layer of structural glass is above a layer of fire-rated glass, but load from the structural glass rests on structural "load transferring means" ("LTMs") that bypass the fire rated glass to transmit that load directly to the structural frame supporting the floor.  Embodiments of the invention involve structural glass, fire rated glass, structural steel, silicone pads and adhesives, and intumescent materials,[3] among other substances.  According to its specifications, the '475 patent represents an improvement over prior art in which the two layers were respectively supported on the top and bottom flanges of structural I-beams in that it reduces space between the structural glass and the fire rated glass and thus produces a more desirable appearance.  '475 Patent at 1:20–28, 1:59–67.[4]

---

[2] All citations herein to Safti's answer and counterclaim refer to the paragraphs of the counterclaim portion of that document, which begins at the bottom of page 4.
[3] Intumescent material expands when heated in order to serve as insulation in the event of a fire.
[4] The '475 patent appears in the record in a number of places, including as Exhibit 1 to attorney Philip Bautista's declaration (dkt. 187-1) in support of Plaintiffs' motion for summary judgment.

The specifications also distinguish the '475 patent from an existing system in which the structural and fire rated layers were directly bonded together and the bottom fire rated layer carried the full load of the floor, which was limited to 30 minutes of integrity and insulation in the event of a fire, and which required expensive replacement of the entire glass assembly if the surface layer of structural glass was damaged during use. *Id.* at 1:29–33.

Plaintiffs assert that Safti infringed the following claims, with terms that the Court has previously construed designated by italics:

> 1. A fire rated glass flooring system comprising:
>
>> a first layer of glass which comprises a structural glass;
>
>> a second layer of glass which comprises a fire rated glass, wherein the first layer of glass is positioned above the second layer of glass;
>
>> one or more load transferring means; and
>
>> a structural frame comprising a plurality of beams and a plurality of cross members interconnecting the beams, wherein the structural frame supports the first and second layers of glass and the one or more load transferring means;
>
> characterized in that
>
>> [*A:*] *the two layers of glass are separated by one or more of the load transferring means*, and
>
>> at least one of the load transferring means comprises
>
>>> a horizontal portion supporting the first layer of glass above and
>
>>> [*B:*] *a vertical portion transferring load from the first layer of glass above directly to the structural frame below, bypassing the second layer of glass.*
>
> 2. A fire rated glass flooring system as claimed in claim 1 wherein [*F:*[5]] *the distance from the upper surface of the second layer of glass to the lower surface of the first layer of glass is less than 50 mm.*
>
> . . .
>
> 6. A fire rated glass flooring system as claimed in claim 1 wherein the horizontal portion of the load transferring means in use extends

---

[5] This order addresses the disputed terms in the same order and with the same labels as presented by the parties, which is not the order in which they appear in the patent.

United States District Court
Northern District of California

parallel to and between the first and second layers of glass.

7. A fire rated glass flooring system as claimed in claim 1 wherein the vertical portion of the load transferring means in use extends upwardly from the structural frame.

8. A fire rated glass flooring system as claimed in claim 1 wherein the horizontal portion of the load transferring means is perpendicular to and is in load transferring contact with the vertical portion of the load transferring means.

. . .

12. A fire rated glass flooring system as claimed in any one of claims 1 to 11 wherein the vertical portion of the load transferring means is one or more metal strips extending upwardly from the structural frame along the length thereof.

13. A fire rated glass flooring system as claimed in claim 1 wherein the or each load transferring means is located on the structural frame and is of size and shape such that the first layer of glass is supported by the or each load transferring means.

. . .

21. A fire rated glass flooring system as claimed in claim 13 wherein [*C:*] *the second layer of glass is suspended from the first layer of glass such that there is a small gap between the first and second layers of glass.*

'475 Patent at 8:39–9:64.  Although Plaintiffs' operative complaint also alleges infringement of claims 5, 11, 16, 24, 25, 26, and 28, Plaintiffs no longer pursue a theory of infringement of those claims.  *See* TAC ¶ 14; Pls.' MSJ (dkt. 187) at 1–2.

    Following briefing and a tutorial, the Court previously construed the disputed claim terms of the '475 patent as follows:

| | Claim | Disputed Term | Court's Construction |
|---|---|---|---|
| A. | Claim 1 | "the two layers of glass are separated by one or more of the load transferring means" | "the structural glass and the fire-rated glass are separated by one or more of the load transferring means, such that the structural glass does not touch the fire-rated glass" |

|  | Claim | Disputed Term | Court's Construction |
|---|---|---|---|
| B. | Claim 1 | "a vertical portion transferring load from the first layer of glass above directly to the structural frame below, bypassing the second layer of glass" | "a vertical portion of the load transferring means, transferring (either alone or in conjunction with the vertical portions of other load transferring means) all load from the structural glass layer directly to the structural frame below, such that no load from the structural glass is transmitted to the fire-rated glass" |
| C. | Claim 21 | "the second layer of glass is suspended from the first layer of glass such that there is a small gap between the first and second layers of glass" | "the fire-rated glass hangs from the structural glass such that there is a distance of less than 50 mm but more than 0 mm between the lowermost surface of the structural glass and the uppermost surface of the fire-rated glass, with air filling some portion of the space between the structural glass and the fire-rated glass" |
| D. | Claim 24 | "the load transferring means transfers load applied to the first layer of glass directly to the structural frame, bypassing the second layer of glass" | "the load transferring means collectively transfer all load applied to the structural glass directly to the structural frame, such that no load from the structural glass is transmitted to the fire-rated glass" |

| | Claim | Disputed Term | Court's Construction |
|---|---|---|---|
| E. | Claim 24 | "comprising a first layer of glass which is a structural glass and a second layer of glass which is a fire rated glass" | "Composed of:<br>(i) "a laminated glass sheet made up of two or more layers of glass capable of bearing weight; and<br>(ii) "a multi-layered glass sheet meeting all of the following conditions:<br>   a. "made up of two or more layers of glass;<br>   b. "having a transparent intumescent material interspaced between at least two of the glass layers;<br>   c. "having glass as its outer layers; and<br>   d. "rated as possessing a designated fire resistance certified by a testing authority." |
| F. | Claim 2 | "the distance from the upper surface of the second layer of glass to the lower surface of the first layer of glass is less than 50 mm" | [no construction beyond plain meaning] |
| G. | Claim 24 | "the first layer of glass being supported by the or each load transferring means and the second layer of glass being supported by the structural frame" | "The load transferring means bears the weight of the structural glass and the structural frame bears the weight of the fire-rated glass, such that the structural glass does not bear the weight of the fire-rated glass." |

|   | Claim | Disputed Term | Court's Construction |
|---|-------|---------------|----------------------|
| H. | Claim 25 | "load transferring means comprises a first portion for bearing the load applied to the first layer of glass and a second portion for transmitting the load applied to the first layer of glass to the structural frame" | "load transferring means comprises a first portion for bearing the load applied to the structural glass and a second portion for transmitting the load applied to the structural glass to the structural frame, such that the load transferring means collectively bear all of the load applied to the structural glass" |
| I. | Claim 11 | "glazing bar" | "metal bar" |

Claim Construction Order (dkt. 112)[6] at 19–21; Further Order re Claim Construction (dkt. 142)[7] at 4.

### C.   Safti's Product

Plaintiffs base their claims on Safti's 120-minute GPX FireFloor product ("GPX 120"). *See, e.g.*, Pls.' MSJ at 4–5.  One configuration of that product is made of up three layers of thicker glass at the top intended to carry weight, with alternating layers of intumescent material and thinner glass below that, and a toggle that fits into a notch below the structural glass layer to support the full assembly from a structural frame on which the toggle is mounted.  *See, e.g.*, Bautista MSJ Decl. (dkt. 187-1) Ex. 4 (MacFarlane Opening Report) Ex. AA.  Turning a bolt in the toggle adjusts the height of the floor by lifting the layered assembly off the frame, such that the full weight of the layered assembly is borne by the toggles.  *See id.* ¶ 75.  A partial diagram of that configuration is as follows, with the glass layers shaded, the intumescent material in white, and the toggle appearing on the right:

---

[6] *Ely Holdings Ltd. v. O'Keeffe's, Inc.*, No. 18-cv-06721-JCS, 2019 WL 6911667 (N.D. Cal. Dec. 19, 2019).  Citations herein to the Court's previous orders refer to pages of the versions filed in the Court's ECF docket.
[7] *Ely Holdings Ltd. v. O'Keeffe's, Inc.*, No. 18-cv-06721-JCS, 2020 WL 511799 (N.D. Cal. Jan. 31, 2020).



*Id.* Ex. AA.

There is some dispute as to the extent to which other versions of GPX 120 have been constructed or offered for sale either without the toggle (in which case the lowest layer of glass would rest on the frame) or with sealed or unsealed air between some of the layers.

### D.    The Relevant Projects

The project most central to the parties' arguments is the Transbay Transit Center project in San Francisco, for which both parties bid to provide glass flooring in 2015.  Greenlite ultimately received that contract.  Plaintiffs contend that Safti offered to sell a floor that infringed the '475 patent, falsely asserted that Greenlite was "obligated to buy German glass," falsely asserted that Greenlite did not have a two-hour fire rating for its floor, falsely asserted that Greenlite was not environmentally friendly, and "recklessly" threatened to exert political pressure to reverse the selection of Greenlite for the contract, thus causing Greenlite to revise its bid and receive a lower price than it otherwise would have.  Most of those assertions are not at issue in the present motions, since neither party seeks summary judgment on Plaintiffs' misrepresentation and interference claims.  Safti contends that Greenlite misrepresented the origin of its glass to conceal that it could not meet the project's "Buy America" requirement until too late in the process to choose a different glass floor vendor.  *See* Def.'s MSJ (dkt. 189) at 14–15.

The parties also address a number of other projects.  Plaintiffs contend that Safti sold infringing products for projects at San Francisco's Union Square subway station (a project where Greenlite was originally under contract but later removed) and a building at 1050 17th Street NW in Washington, DC.  Pls.' MSJ at 6.  Safti argues that Greenlite misrepresented its "Buy America"

1  in bidding for the Union Square project.  Def.'s MSJ at 15–16.  Safti contends that it was awarded

2  a contract for a project at 20 Washington Street in Princeton, New Jersey in 2015, but was

3  removed from the project and replaced with Greenlite after Greenlite falsely accused Safti of

4  potential patent infringement and lacking a fire rating.  *Id.* at 17.  For a project at the Willis Tower

5  in Chicago, Safti contends that Greenlite wrongly accused Safti in 2017 of having "copied our

6  patented floor system," lacking a legitimate fire test result, and having not yet done its "first

7  project."  *Id.*

8          **E.**    **The Parties' Arguments**

9                  **1.**    **Plaintiffs' Motion for Partial Summary Judgment**

10                          a.    <u>Plaintiffs' Motion</u>

11        Plaintiffs argue that they are entitled to summary judgment on infringement because all

12  embodiments of Safti's GPX 120 product "contain each and every limitation of claims 1, 2, 6,7, 8,

13  12, 13, and 21 of the '475 Patent," in that they have a structural top layer of glass, a lower portion

14  of glass and intumescent material that Plaintiffs assert has been independently rated for fire

15  resistance, a structural frame of beams, and load transferring mechanisms in the form of "a

16  plurality of toggle mechanisms welded to the upper surface of the beams in the structural frame at

17  6" intervals, each of which includes a horizontal steel plate (i.e. a horizontal portion), a Nylock nut

18  to hold the horizontal steel plate at a fixed height, and a vertical Allen bolt screwed into a threaded

19  receptacle welded to the beam below."  Pls.' MSJ at 4–5, 10–11.  According to Plaintiffs, a

20  decision of the Patent Trial and Appeal Board ("PTAB") establishes that Safti offered a version of

21  the GPX 120 flooring system that includes those toggle mechanisms for sale for the Transbay

22  project.  *Id.* at 12.  Plaintiffs contend that the GPX 120 products include space between the

23  structural layer and the fire resistant layer, with that space either filled with more intumescent

24  material or, in some embodiments that Safti purportedly offered for sale, filled with sealed air.  *Id.*

25  at 5–6.

26        Safti's expert Dr. Glen Stevick opined that Safti's product does not infringe because

27  "(1) some load transfers from the walking surface to the lower glass layers (2) the floor contains

28  nothing but structural glass and fire glass [and] (3) there is no separation between the two layers."

United States District Court
Northern District of California

Schickman MSJ Decl. (dkt. 189-2) Ex. 2 (Stevick Reply Report) ¶ 26(d). Dr. Stevick's opinion regarding load transfer, and thus the lack of a complete bypass of load, is based on the premise that the intumescent material below and in contact with the structural layer would transfer load to the additional layers of glass and intumescent material below that, and ultimately transfer that load back to the structural layer and the toggles that support the structural layer—effectively stiffening the floor panel, an effect that Plaintiffs' expert Tim MacFarlane also acknowledged, although he disagreed with Dr. Stevick's conclusion that such stiffening implicates the limitations of the '475 patent. *See id.* ¶¶ 44(c), 60–65; Schickman MSJ Decl. Ex. 4 (MacFarlane Dep.) at 230:8–233:5.

Plaintiffs contend that the purported embodiment with a sealed airspace, as well as versions Safti has purportedly offered for sale with separate structural and fire-resistant sheets and unsealed airspace between them, negate those opinions. Pls.' MSJ at 11–13. Plaintiffs also argue the embodiments with intumescent material infringe the '475 patent, either through literal infringement because space filled with some material satisfies the Court's construction of "separated" layers and no load would transfer between layers in the event of a fire (for which the products are designed), or under the doctrine of equivalents because the stiffening effect of adhering fire resistant glass below the structural glass in a non-fire situation is not a significant transfer of load for the purposes of the patent. *Id.* at 13–17. Plaintiffs further contend that they have presented unrebutted evidence of Safti's awareness of the patent and of its infringement, sufficient to support summary judgment on willful infringement. *Id.* at 20–21.

Plaintiffs seek summary judgment on Safti's invalidity counterclaim because Safti's expert Dr. Stevick relies solely on prior art that was before the patent examiners when the '475 patent was issued, and the decision to issue the patent despite that prior art is entitled to deference. *Id.* at 18. Plaintiffs contend that Figure 1 of the '475 patent, showing prior art in which structural glass and fire rated glass are separately supported by upper and lower flanges of an I-beam, cannot depict a "load transferring means" as that term is used in the patent because beams are identified in the patent's claims as part of the structural frame rather than the load transferring means, and the patent's specification distinguishes between load transferring means and beams, describing the layers as "'separated by at least one load transferring means rather than a deep beam.'" *Id.* at 19–

20 (quoting '475 Patent at 1:63–67) (Plaintiffs' emphasis omitted).  Plaintiffs argue that a French patent identified by Dr. Stevick was cited during the examination of the '475 patent, that like Figure 1, it relies at least in part on the frame rather than separate load transferring means to support the structural glass, and that what Dr. Stevick identifies in that patent as a purported horizontal load transferring means would not be able to support the applied load of a person walking on the glass.  *Id.* at 20.

With respect to Safti's misrepresentation counterclaims, Plaintiffs contend that Greenlite did not misrepresent the source of its glass for the Transbay project, but instead disclosed as early as March of 2015 that its glass was produced in Germany.  *Id.* at 8, 23.  Plaintiffs also argue that Safti's claims fail as to that project because the contractor rejected Safti's proposal on account of high cost, not any representation by Greenlite.  *Id.*  For the 20 Washington project, Plaintiffs contend that none of the representations in the email on which Safti relies were false: that Greenlite had not seen the details of Safti's product was true, that Safti was "trying to be sneaky" was an opinion, that Safti would infringe the '475 patent "if the Safti details look anything like our details" was a legal opinion framed as a conditional statement, and that Safti lacked a fire rating for its flooring product "[f]rom what [Greenlite's president Ryan Dennett] can find on UL and Intertek directories"[8] was accurate when Dennett had not been able to find such a certification.  *Id.* at 8–9.  Plaintiffs also argue that Safti has identified no evidence that such statements affected the 20 Washington architect's decision, and that the architect instead rejected Safti's proposal for failure to meet architectural specifications.  *Id.* at 9.  Plaintiffs argue that Safti cannot base its counterclaims on any other project because Safti's damages expert addressed only the Transbay project and the 20 Washington project, citing a November 18, 2020 email from Safti's counsel confirming that those were the two projects Safti claimed it lost as a result of Greenlite's purported misconduct.  *Id.* at 7 & n.1; Bautista MSJ Decl. Ex. 19.[9]

---

[8] UL (also known as Underwriters Laboratory) and Intertek are two recognized authorities for certifying compliance with safety standards.

[9] Plaintiffs also briefly argue in their motion for summary judgment that Safti abandoned its counterclaims by failing to reassert them in its answer to Plaintiffs' third amended complaint, citing two district court decisions.  Pls.' MSJ at 17–18 (citing *Bryant v. Mattel, Inc.*, No. CV 04-

United States District Court
Northern District of California

1

          b.    <u>Safti's Opposition to Plaintiffs' Motion for Summary Judgment</u>

2

       Safti contends that it never certified, sold, or drew plans for a potential customer of any

3

GPX flooring system with an air layer, and that a reference to such a configuration in a marketing

4

brochure on which Plaintiffs rely was an error, which regardless did not indicate the inclusion of

5

any load transferring means, and the brochure was not an offer for sale as a matter of law.  Def.'s

6

Opp'n to MSJ (dkt. 201) at 3–4.

7

       While Safti does not dispute that it sold the version of the GPX 120 floor with a toggle to

8

the Union Square and 17th Street projects, it argues that there is no evidence it offered a product

9

with the toggle (which, in Safti's view, is the only way Plaintiffs have claimed Safti's product

10

infringes the "load transferring means" limitation of the '475 patent) for the Transbay project.  *Id.*

11

at 4–5 & n.2.  Safti contends that the PTAB decision finding that a drawing including the toggle

12

reflects the product offered for sale on that project is on appeal to the Federal Circuit and thus is

13

not preclusive as a final administrative decision.  *Id.*  Regardless, Safti contends that the toggle

14

does not establish infringement of the '475 patent, because even on the versions of its product with

15

that device, some load is transmitted through the fire resistant layers of glass, *id.* at 6–7, because

16

the fire resistant glass touches (and thus is not separated from) the structural glass, *id.* at 7–8, and

17

because the fire rating applies only the whole product as single unit, not to any subset of the

18

product, *id.* at 8.  Safti argues that MacFarlane's opinions regarding infringement through the

19

doctrine of equivalents were disclosed too late to be considered, and that the load transfer is not

20

equivalent to the claim limitations calling for a bypass of load and would improperly vitiate those

21

limitations.  *Id.* at 8–10.  Even if the Court determines that Plaintiffs have shown infringement,

22

23

9049 DOC (RNBx), 2010 WL 11463865, at *5 (C.D. Cal. Oct. 5, 2010); *Johnson v. Berry*, 228 F.

24

Supp. 2d 1071, 1079 (E.D. Mo. 2002)).  *Johnson* held as Plaintiffs argue here, addressing a point not raised by any party, in the context of defaults by multiple parties.  *Bryant* held only that a party

25

need not move for leave to amend to modify its counterclaims when it files a new answer to a new complaint.  Neither Safti's opposition brief nor Plaintiffs' reply addresses this argument further.

26

Plaintiffs do not suggest that they were prejudiced by Safti's failure to reassert its counterclaims or lacked notice that Safti still intended to pursue them.  To the extent that Safti was required to

27

reassert its counterclaims in its most recent answer, the liberal amendment policies of the Federal Rules of Civil Procedure would require allowing Safti to amend its answer to do so.  *Cf.* Fed. R.

28

Civ. P. 15(a)(2), (b).  The Court therefore deems Safti's answer to the third amended complaint amended to incorporate the counterclaim portion of its previous answer.

United States District Court
Northern District of California

United States District Court
Northern District of California

Safti contends that they have not shown willfulness. *Id.* at 10–11.

Safti contends that Dr. Stevick's report establishes that the relevant claims of the '475 patent are invalid because they are both anticipated by and rendered obvious by Figure 1 of the '475 Patent, depicting prior art involving an I-beam. *Id.* at 11–12. Safti does not address the French patent that is also discussed in Dr. Stevick's invalidity report. *See id.*

With respect to its counterclaims, Safti contends that Plaintiffs are not entitled to summary judgment because Greenlite misrepresented the origin of its product in bidding on the Transbay project and the Union Square project, failed to seek a formal waiver of the Buy America Act's requirements, and won both contracts based on those misrepresentations (although Greenlite was later removed from the Union Square project and replaced with Safti). *Id.* at 13–16. Safti asserts that Greenlite misrepresented Safti's patent compliance and fire rating status to an engineer responsible for the Willis Tower project in 2017, and to an architect responsible for the 20 Washington project in September of 2015, with the latter closely preceding Safti's removal from the 20 Washington project and Greenlite's selection to replace it. *Id.* at 17. Safti contends that Greenlite's personnel had not seen any details of Safti's product or identified any basis for infringement at the time of those representations, and that Safti had in fact received a fire rating from Intertek in August of 2015. *Id.* Safti asserts that Greenlite's purported misconduct led to Safti losing the Transbay and 20 Washington jobs. *Id.* at 18–19. Safti also argues that Greenlite falsely advertised itself as having over 50 "professionals" despite never employing more than two people and as having completed over 100 projects when it in fact built fewer than 40 floors. *Id.* at 16.[10] According to Safti, Greenlite's purported misrepresentations violate the Lanham Act and the UCL, with the latter also implicated by Greenlite's purported violation of the Buy America Act. *Id.* at 19–20.

---

[10] Safti further asserts that Greenlite advertised itself as—in Safti's words—making "the only floor available in North America for exterior use," but the only evidence Safti cites for that purported misrepresentation consists of pages that do not appear in the deposition excerpt Safti has provided. *See* Def.'s Opp'n to MSJ at 16 (citing pages 199, 200 and 203 of Exhibit 8 to attorney Mark Schickman's declaration submitted with the opposition); Schickman Opp'n Decl. (dkt. 201-1) Ex. 8 (including only pages 1, 46–49, 67, 96–105, and 122 of Ryan Dennett's deposition transcript). The Court disregards that assertion as unsupported by evidence.

United States District Court
Northern District of California

Several pages of Safti's opposition brief address potential counterclaims for interference with contractual relations or economic advantage, which Plaintiffs' motion does not address because Safti has not actually asserted those claims in any pleading, although Safti indicates in a footnote of its opposition that it might seek leave to amend to do so. *See id.* at 20–23 & n.8. Finally, Safti argues that an opinion by Plaintiffs' expert Tim MacFarlane regarding the nature of a fire rating for one of Safti's products should be stricken as contrary to the evidence and outside of MacFarlane's expertise, *id.* at 23–24, and that two paragraphs of a declaration by former Safti employee Jeff Griffiths should be stricken as conclusory opinions by a lay witness lacking necessary foundation, *id.* at 24–25.[11]

### c.  Plaintiffs' Reply in Support of Summary Judgment

Plaintiffs contend in their reply that Griffiths's declaration shows Safti built a version of the GPX floor system with an air space at least for testing purposes, which Plaintiffs contend would violate 35 U.S.C. § 271(a)'s prohibition of *making* an infringing product, and that other documents besides the purportedly erroneous marketing brochure also indicate the existence of such a configuration.  Pls.' MSJ Reply (dkt. 207) at 1–2.  With respect to offering for sale a version with toggles, Plaintiffs contend that although the PTAB order at issue is on appeal, Safti has not appealed the "factual finding that the system offered to [Transbay] contractors included a toggle," and thus is estopped from arguing to the contrary here.  *Id.* at 2.  Plaintiffs also argue that the shop drawing on which the PTAB based its decision is itself evidence that the version with toggles was offered for sale, even if the PTAB's decision is not entitled to deference.  *Id.* at 2–3.

---

[11] Safti initially filed its evidentiary objections as separate documents, in violation of the Court's local rules regarding briefing and page limits.  The Court granted Safti a period of three days to remedy the error by filing a corrected opposition brief incorporating all evidentiary objections within the allowed page limit.  *See* dkt. 196.  Plaintiffs object in their reply that Safti used that time not only to incorporate its objections within the brief, but also to alter and expand on its substantive arguments.  Plaintiffs ask the Court to strike the corrected opposition brief entirely or to disregard the new material.  While Safti's approach was perhaps a questionable response to the Court's order, the order did not expressly limit how Safti could alter its brief, and Plaintiffs were not prejudiced by the changes because the Court altered the briefing schedule to allow Plaintiffs sufficient time to respond.  The Court therefore declines to strike any portion of Safti's corrected brief.  The Court also declines Plaintiffs' invitation to strike any of Safti's briefs for being filed hours after the deadlines to do so, but admonishes Safti that further untimely filings may be stricken or result in other sanctions.  The Court does not reach Safti's evidentiary objections to the redline comparisons of the opposition brief submitted with Plaintiffs' reply.  *See* dkt. 209.

1    Plaintiffs contend that the toggle meets the patent's definition of a load transferring means

2    even if some load transfers from the structural glass to the fire resistant glass in a non-fire

3    condition because in the event of a fire, the fire resistant glass would be destroyed and all load

4    would be carried by the toggles, and that as a matter of law, Plaintiffs can establish infringement

5    even if the GPX 120 product only meets the limitations of the patent under certain circumstance

6    (i.e., in a fire). *Id.* at 3–4.

7    Plaintiffs argue that the fire resistant glass meet does not touch the structural glass because

8    there is a layer of intumescent material between them. *Id.* at 4. Plaintiffs cite a fact sheet for a

9    different product with a similar configuration to the bottom layers of the GPX 120 product,

10   SuperLite II-XLB 120, as evidence that the lower layers of the GPX 120 are themselves certified

11   as fire resistant, as needed to meet the definition of "fire rated glass" established during claim

12   construction. *Id.* at 4 (citing McPhail Opp'n Decl. (dkt. 192-1) Ex. 1).

13   Plaintiffs argue again that even if the GPX 120 product does not literally infringe the '475

14   patent for failure to completely bypass load to the fire resistant layer, it infringes under the

15   doctrine of equivalents because the load conveyed to that layer is not significant and the toggles

16   are necessary for the product's performance in a fire. *Id.* at 5–6. Plaintiffs also argue once again

17   that Safti's purported infringement was willful. *Id.* at 6. As for validity, Plaintiffs stand by the

18   arguments in their motion but add that even if the Court agreed with Dr. Stevick's view of the

19   claims he assessed, he did not address claims 6 and 7 and Plaintiffs should be entitled to summary

20   judgment of the non-invalidity of those claims. *Id.* at 6–7.

21   Turning to Safti's counterclaims, Plaintiffs contend the Greenlite did not misrepresent the

22   origin of its glass for the Transbay project because "as early as March 2015 and formally in

23   December 2015, Greenlite informed Transbay Project decision makers that it would be supplying

24   glass from Germany," which Plaintiffs contend Safti's president William O'Keeffe admitted

25   during his deposition. *Id.* at 7. Plaintiffs argue that Safti improperly relies on emails that

26   Greenlite sent to other parties who were not decisionmakers for the Transbay project to show

27   concealment, and that Dennett testified at his deposition that he believed Greenlite would be able

28   to manufacture the glass in the United States. *Id* at 7–8. Plaintiffs also contend that even if Safti

United States District Court
Northern District of California

15

can show a misrepresentation, Safti has not identified evidence that Greenlite would have been

rejected and Safti would have gotten the contract but for any such misrepresentation. *Id.* at 8–9.

For the 20 Washington project, Plaintiffs contend that all of Dennett's statements were either

opinions or true statements of what he had been able to determine regarding Safti's fire rating

status, and that the architect rejected Safti for failure to meet design specifications, not because of

Dennett's statements. *Id.* at 12.

Plaintiffs argue that Safti cannot base a claim on the Union Square project because it has

identified no evidence of damages from that project (for which Safti was ultimately awarded the

contract) and that Safti has not identified any actual misrepresentations with respect to that project.

*Id.* at 9–10.  Similarly, with respect to the Willis Tower project, Plaintiffs contend there is no

evidence that any purported misrepresentation caused Safti to lose that project, and offer an email

from a project engineer stating that the owners decided to use a metal floor instead of a glass floor.

*Id.* at 11 (citing Dennett Reply Decl. (dkt. 207-10) Ex. 2).

Plaintiffs contend that the representations on its website regarding the number of

professionals it works with and the number of projects completed with the Liteflam product are

accurate, and regardless, Safti has identified no evidence that any customer relied on those

representations.  *Id.* at 10.

Finally, Plaintiffs argue that Safti's UCL counterclaim should stand or fall with its Lanham

Act counterclaim, and that the Court should reject Safti's attempt to raise new intentional

interference counterclaims for the first time in its opposition brief.  *Id.* at 13.

### 2.    Safti's Motion for Partial Summary Judgment

#### a.    Safti's Motion

Safti moves for summary judgment of noninfringement on multiple grounds.  First, Safti

contends that its GPX 120 product is a single assembly of a walking surface fused to fire resistant

glass, not separated layers of structural glass and fire rated glass as claimed in the '475 patent.

Def.'s MSJ at 10–12.  Safti contends that the highest layer of intumescent material is part of the

fire resistant glass, not a separation between structural glass above and fire resistant glass below.

*Id.* at 10–12, 16–17.  Safti also argues that Dr. Stevick's reports show that load transfers from the

United States District Court
Northern District of California

United States District Court
Northern District of California

top structural layer of the GPX 120 floor to the fire resistant layers below, such that those layers are not entirely "bypassed" by the toggles. *Id.* at 12–16.

Of particular significance to the Court's analysis below, Safti asserts that while the Court "logically found that a fire-rated floor must be rated by a certifying entity," "the GPX 120 has no 120-minute fire rating except as a unit"—no portion of it has been rated separately, and it would not have the same performance in a fire without all four layers of intumescent material, including the layer directly below the structural glass surface. *Id.* at 16–17.

As discussed above in the context of Safti's opposition to Plaintiffs' motion, Safti contends that the '475 patent is invalid because Figure 1 of the patent depicts prior art that anticipates and renders obvious claim 1, based on Dr. Stevick's invalidity report. *Id.* at 17–19.

While Safti does not seek summary judgment on Plaintiffs' other claims, it seeks summary adjudication that it did not offer a product with toggles for sale to the Transbay project, because it had not yet invented the toggles at the time it made its bid and no toggles are depicted in the bid plans. *Id.* at 20–21. According to Safti, a ruling in its favor on that issue would resolve "the largest of [Plaintiffs'] ancillary claims," i.e., "that Safti proposed an infringing load transferring means to the Transbay project." *Id.* at 21.

    b. <u>Plaintiffs' Opposition to Safti's Motion for Summary Judgment</u>

Plaintiffs contend that Safti has not shown invalidity because the I-beam in Figure 1 is not a load transferring means as that term is used in the '475 patent. Pls.' Opp'n to MSJ (dkt. 192) at 2–4.

For infringement, Plaintiffs argue that the '475 patent encompasses configurations in which the upper layer of structural glass is connected to the lower level of fire resistant glass, including where the two are connected by a layer of intumescent material, and that the structural glass component of GPX 120 does not touch the fire resistant glass component, even when they are connected by intumescent material. *Id.* at 4–5, 9–11. Plaintiffs assert that Safti manufactures the structural component separately from the fire resistant component. *Id.* at 10. Plaintiffs contend that all embodiments of GPX 120 have a "gap," either in the form of a sealed airspace that Safti sometimes advertised, or in the form of the small notch below the structural gap where the

United States District Court
Northern District of California

1    highest layer of intumescent material does not extend to the edge of the structure in order to allow

2    the toggle to fit below the structural layer and support it, but even if there were no such space,

3    many claims of the patent do not require a gap or air space. *Id.* at 6–9. Plaintiffs argue that no

4    load is transferred through the fire resistant glass to the structural frame because the fire resistant

5    glass is suspended above the frame by the structural glass and does not rest on the frame, or at the

6    very least that it would be so suspended in the event of a fire that consumes the lowest layers for

7    fire resistant material. *Id.* at 11–14. Plaintiffs also argue that any load that might be transferred

8    through the fire resistant layer is de minimis and does not preclude a finding of infringement. *Id.*

9    at 14–15.

10         As in their reply brief discussed above, Plaintiffs contend that the "fire resistive portion" of

11   the GPX 120 product has, on its own, been rated for 120 minutes of fire resistance as another

12   product, SuperLite II-XLB. *Id.* at 5–6. Plaintiffs provide a diagram showing that the two products

13   have the same basic structure of four layers of glass and three layers of intumescent material (not

14   including the structural glass or top layer of intumescent material in the GPX 120, which Plaintiffs

15   contend are not part of the "fire rated glass" component). *Id.* at 6.

16         With respect to the Transbay project, Plaintiffs argue that the Court should follow the

17   PTAB's conclusion that a shop drawing depicting toggle mechanisms was the product offered for

18   sale. *Id.* at 17–18. Even if the Court disagrees as to that drawing, Plaintiffs contend that a

19   February 2015 email from Jeff Griffiths (then Safti's director of business development) to the

20   bidding authority for the Transbay project attached results of Safti's in-house fire testing,

21   including for a configuration that included a different type of load transferring means in the form

22   of steel blocks. *Id.* at 18–19 (citing Bautista Decl. Ex. 8 (Griffiths Decl.) Exs. C, D.

23         Plaintiffs ask the Court to give "no weight" to the declaration of Safti president William

24   O'Keeffe on account of purported inconsistencies between his testimony and documentary

25   evidence. *Id.* at 19–20.

26                        c.    <u>Safti's Reply in Support of Summary Judgment</u>

27         Safti contends in its reply brief that GPX 120's "bonded, unitized structure takes it out of

28   the scope and limitations of the '475 patent," Def.'s MSJ Reply (dkt. 208) at 1, because it does not

                                                    18

have the two separate structural glass and fire rated glass components described in the patent, *id.* at 3.  Safti notes that no part of the GPX 120 product has a fire rating on its own, when not incorporated into the full product.  *Id.* at 3–6.  Safti contends that the other product identified by Plaintiffs as holding a fire rating is distinct from the lower layers of the GPX 120 product, and has different dimensions.  *Id.* at 5.

Safti argues that the notch where the toggle fits below the structural layer is not a "small gap" as contemplated by the patent and the Court's claim construction order because it is "in space outside of the glass layers."  *Id.* at 6–7 (heading capitalization altered).  Safti also continues to argue the transfer of load from the structural surface to the fire resistant layers below (due to the fact that they are bonded together), which occurs even during a fire, precludes a finding of infringement.  *Id.* at 7–9.  Safti contends that the prosecution history of the patent undermines Plaintiffs' argument based on the doctrine of equivalents, because applying that doctrine to allow some degree of load transfer would implicate prior art that the inventor added the "bypass" language in order to distinguish.  *Id.* at 10.

Safti also argues again that the prior art depicted in Figure 1 of the '475 patent anticipates and renders obvious its claims, and that there is no evidence Safti offered to sell to the Transbay project (as opposed to merely testing internally) a GPX 120 floor with toggles.  *Id.* at 11–14.  Safti disputes Plaintiffs' contention that it has not preserved that issue in its appeal of the PTAB decision, asserting instead that it is the first issue Safti raises in the appeal.  *Id.* at 13 n.2.

### 3.    The Parties' Motions to Exclude Expert Testimony

The parties have each filed a motion to exclude certain opinions of their opponents' expert witness under the standard of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 583 (1993).  This order addresses the limited portion of those challenges that are relevant to the Court's analysis in context below.

The remaining challenges not addressed herein relate to testimony that appears to be only relevant, if at all, to claims disposed by this order on other grounds—i.e., the parties' claims regarding patent infringement and invalidity.  If any party believes that conclusion is incorrect and expert opinions that party has challenged might remain relevant to a claim that will proceed to

1  trial, the parties shall meet and confer to determine whether the party that offered the testimony

2  still intends to use it at trial.  If so, the parties may file a joint notice to that effect no later than

3  February 24, 2021, and the Court will consider the challenge to that testimony based on the briefs

4  and evidence in the record.  The parties may not bring new *Daubert* challenges to expert opinions

5  not addressed in their present motions, nor may they submit further briefing or evidence on the

6  challenges already submitted.

7  **III.    ANALYSIS**

8        **A.    Legal Standard for Summary Judgment**

9           Summary judgment on a claim or defense is appropriate "if the movant shows that there is

10  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

11  law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

12  the absence of a genuine issue of material fact with respect to an essential element of the non-

13  moving party's claim, or to a defense on which the non-moving party will bear the burden of

14  persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

15           Once the movant has made this showing, the burden then shifts to the party opposing

16  summary judgment to designate "'specific facts showing there is a genuine issue for trial.'"  *Id.*

17  (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely

18  disputed must support the assertion by . . . citing to particular parts of materials in the record

19  . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the

20  substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v.*

21  *Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of

22  identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan*

23  *v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court "'to scour the

24  record in search of a genuine issue of triable fact.'"  *Id.* (citation omitted); *see Carmen v. S.F.*

25  *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

26           A party need not present evidence to support or oppose a motion for summary judgment in

27  a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

28  to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir.

*United States District Court*
*Northern District of California*

2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

Applying that standard to the cross-motions for summary judgment at hand, the Court draws all reasonable inferences in favor of Safti for the purpose of Plaintiffs' motion, and all reasonable inferences in favor of Plaintiffs for the purpose of Safti's motion.

## B.    Plaintiffs' Claims for Infringement of the '475 Patent

The Federal Circuit has described the standard for patent infringement as follows:

> A determination of infringement requires a two-step analysis. The court must determine (1) "the scope and meaning of the patent claims asserted," and (2) how "the properly construed claims . . . compare[ ] to the allegedly infringing device."  Comparison of the claims to the accused device requires a factual determination that every claim limitation or its equivalent is found in the accused device. Because infringement is a question of fact, infringement is properly decided at summary judgment only "when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device."

*Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1369 (Fed. Cir. 2004) (alterations in original; internal citations omitted).

One of the parties' fundamental disputes is whether Safti's product, the GPX 120 flooring system, is best described as a layer of structural glass positioned over a layer of fire rated glass (as in the '475 patent), or instead only as fire rated glass.  That question goes to whether the product includes the limitation of claim 1 of the '475 patent, also incorporated by each asserted dependent claim, that the product must contain both "a first layer of glass which comprises a structural glass" and "a second layer of glass which comprises a fire rated glass, wherein the first layer of glass is positioned above the second layer of glass."  '475 Patent at 8:40–43.  The inquiry is complicated by the fact that, as the parties agreed in the context of claim construction, both "structural glass"

and "fire rated glass" are composed of multiple layers of material bonded together.

The Court construed "structural glass" as meaning "a laminated glass sheet made up of two or more layers of glass capable of bearing weight," and fire rated glass as meaning:

> a multi-layered glass sheet meeting all of the following conditions:
>
> a.   made up of two or more layers of glass;
>
> b.   having a transparent intumescent material interspaced between at least two of the glass layers;
>
> c.   having glass as its outer layers; and
>
> d.   rated as possessing a designated fire resistance certified by a testing authority.

Further Order re Claim Construction at 4.  Although the Court construed those terms as parts of a larger disputed term in the context of Claim 24, which is not at issue in the present motions, neither party suggests that the terms have different meanings in that context than in other contexts in the '475 Patent.

In the embodiment most consistently described in the record, Safti's GPX 120 flooring consists of eleven layers,[12] as follows from the top down: (1) ½" thick glass; (2) ½" thick glass; (3) ½" thick glass; (4) intumescent material; (5) ¼" thick glass; (6) intumescent material; (7) ¼" thick glass; (8) intumescent material; (9) ¼" thick glass; (10) intumescent material; and (11) ¼" thick glass.  *See* Bautista MSJ Decl. Ex. 4 (MacFarlane Opening Report) Ex. AA; Schickman MSJ Decl. Ex. 2 (Stevick Reply Report) ¶ 17(e).  In at least some configurations of the product, layer 4—the uppermost layer of intumescent material—is the only layer that does not extend to the full width of the other layers, in order to allow a metal toggle to fit in that space under the lowest layer of thicker glass and support the whole assembly.  In the figure below, the glass layers are shaded

---

[12] Safti's briefs in some instances describe the product as containing nine layers, a figure Safti reaches by treating the three layers of thicker glass at the top as single layer of structural glass.

United States District Court
Northern District of California

with horizontal lines, while the layers of intumescent material between the glass are white:



Bautista MSJ Decl. Ex. 4 (MacFarlane Opening Report) Ex. AA.  The parties dispute whether different embodiments of the GPX 120 product that may have been offered for sale had different configurations, such as a sealed or unsealed air space between some of the layers, but Plaintiffs neither argue nor identify evidence that any other embodiment differed for the purpose of the "fire rated glass" limitation addressed below.

In Safti's view, the entire assembly meets the Court's construction of "fire rated glass": it has multiple layers of glass, there is transparent intumescent material between some of those layers, the outer layers are glass, and the full assembly has been rated for fire resistance.  *See* Def.'s MSJ Reply at 3–7.  Plaintiffs do not dispute any particular element of that definition. Instead, they argue that layers 5 through 11 (the layers of thin glass and the intumescent material between those layers) are the fire rated glass, while layers 1 through 3 (the thicker glass layers) are the separate structural glass, and the intumescent material that makes up layer 4 is neither structural glass nor fire rated glass.  *See* Pls.' MSJ Reply at 4–5.

Plaintiffs are correct that "characterizing [the] product as a single piece of fire rated glass," would not necessarily preclude a finding of infringement.  *See id.*  Both the invention described in the '475 patent and the term "fire rated glass" refer to assemblies of multiple layers, and it is conceivable that a particular configuration of glass, intumescent material, and perhaps other layers could meet the definition of fire rated glass while containing a subset of its layers that also meets that definition.  So long as such an assembly met the other limitations of at least one claim of the patent, it would infringe, even if the whole assembly could also accurately be described as "fire

United States District Court
Northern District of California

rated glass."

Here, however, Plaintiffs have not shown that Safti's product meets the claim limitation of including a "*second layer* of glass which comprises a fire rated glass," positioned below the structural glass, because Plaintiffs have identified no evidence that the lower portion of Safti's product, taken on its own, is fire *rated*. *See* '475 Patent at 8:41 (emphasis added).[13] During claim construction, the Court adopted Safti's expert witness Dr. Stevick's opinion "that the term 'fire rated glass' denotes that the glass 'has been rated as possessing a designated fire resistance certified by a testing authority.'" Claim Construction Order at 14 (quoting Stevick Opening Report ¶ 34)). Plaintiffs' proposed construction lacked any requirement that the glass be rated by a testing authority, but Plaintiffs offered no evidence to support that view, and the Court declined to do so on the basis that it would be inconsistent with both the plain meaning of the word "rated" and Dr. Stevick's uncontradicted expert opinion. *Id.* "Plaintiffs' expert Tim MacFarlane [did] not address whether fire-rated glass must be tested." *Id.*

Plaintiffs have not asked the Court to reconsider that construction. Instead, Plaintiffs argue that the bottom portion of the GPX 120 product—layers 5 through 11, consisting of the four thin glass layers and the three layers of intumescent material sandwiched between them—is itself fire rated, because it is the same configuration as another Safti product, SuperLite II-XLB 120 ("SuperLite XLB"). Plaintiffs cite a product fact sheet for SuperLite XLB indicating that it holds a 120-minute fire rating from Intertek and that it has a similar basic configuration, consisting of four layers of glass with three layers of intumescent material between them. Pls.' MSJ Reply at 4; Pls.' Opp'n to MSJ at 5–6; McPhail Opp'n Decl. Ex. 1. Plaintiffs cite no other evidence on this point, and do not explain why a finder of fact could infer either that the fire rating for SuperLite XLB would apply to *any* assembly of four layers of glass and three layers of intumescent material, or that those layers are in fact the SuperLite XLB product incorporated within the GPX 120 product.

Another piece evidence the Court has identified that might tend to support that

---

[13] This limitation is included in claim 1, the only independent claim for which Plaintiffs assert infringement, and the basis for all of the dependent claims Plaintiffs assert.

proposition—unaddressed by either party in their briefs submitted before the hearing—is a description in the fact sheet for the accused GPX 120 flooring product indicating that it is a "[s]ingle glass unit *comprised of custom SuperLite II-XLF* combined with a tempered laminated walking surface and a structural steel framing grid." MacFarlane Report Ex. AA (emphasis added). But that product name, ending in XLF, is not the same as the SuperLite XLB product for which Plaintiffs offer evidence of a fire rating. At the hearing, Plaintiffs argued that the difference in naming between XLB and XLF indicates only that one product is intended as a wall while the other is intended as a floor, but Plaintiffs identified no evidence in the record to support that view.

As Safti notes, the SuperLite XLB product that Plaintiffs have identified as fire rated is described as measuring 2 ½" thick, while the portion of the accused GPX 120 product that Plaintiffs assert is the same thing is thicker. Def.'s Opp'n to MSJ at 5; McPhail Opp'n Decl. Ex. 1. According to Safti's president William O'Keeffe, the accused GPX 120 product consists of three ½" layers of glass at the top, four ¼" layers of glass in the lower portion, and four identical 5/8" layers of intumescent material. O'Keeffe Decl. ¶ 9. Those numbers indicate that the lower seven layers—four ¼" layers of glass and three ⅝" layers of intumescent material—come to 2 ⅞" thick, which is ⅜" thicker than the SuperLite XLB product.[14]

Tim MacFarlane's report, which Plaintiffs did not cite for this issue in any brief submitted before the hearing, concludes that the lower portion of the assembly meets the claim limitation of a "fire rated glass" because it consists of layers of intumescent material sandwiched between layers of glass, a UL testing report characterizes it as a "fire resistant layer," and the UL report

---

[14] The measurements in O'Keeffe's declaration total to a thickness of 5" for the GPX 120 product as a whole, which is close to, but not entirely consistent with, the 5 3/16" thickness reported in the GPX 120 product fact sheet. *See* Bautista MSJ Decl. Ex. 4 (MacFarlane Opening Report) Ex. AA. Dr. Stevick's Reply Infringement Report, which Safti also cites for the thickness of the layers, confirms O'Keeffe's figures for the thickness of the glass layers but does not address the thickness of the intumescent material. Schickman MSJ Decl. Ex. 2 (Stevick Reply Report) ¶ 17(e). The difference may be due to thin layers of adhesive between the layers of ½" thick structural glass, but it is not clearly addressed in the record. Assuming for the sake of argument that the adhesive adds no thickness and there is a conflict between O'Keeffe's declaration and the product fact sheet, extrapolating from the 5 3/16" measurement in the product fact sheet and Dr. Stevick's report on the thickness of the glass layers would result in a very slightly greater thickness for the layers that Plaintiffs contend are fire rated, and thus a slightly greater discrepancy between those layers and the SuperLite XLB product.

United States District Court
Northern District of California

"states that the glass unit achieved a 120 minute rating."  MacFarlane Report ¶ 79.  The page of the report that MacFarlane cites includes three labels reading "120 MINUTE FIRE RATED SUPERLITE-II-XLF WITH POLISH CHAMFER ALL AROUND."  *Id.* Ex. O at UL0024.  Each of those labels is appended to an arrow pointing to the *top* layer of glass in the overall assembly. *Id.*  Those labels could thus perhaps refer to the top layer of ½" thick glass, or more likely to the entire eleven-layer assembly, but there is no indication that they are intended to show that the lower seven layers are separately rated for any particular fire resistance.  The Court understands both those labels and MacFarlane's reference to "the glass unit" as addressing the fire rating for the full eleven layers of glass and intumescent material as a single unit.

In the face of a different product name and different thickness, no reasonable finder of fact could conclude, based solely on the fact that they consist of the same number of layers of glass and intumescent material, that the bottom seven layers of the GPX 120 product are the same assembly that received a fire rating as SuperLite XLB.  Plaintiffs have identified no evidence that the two products use the same type of glass or intumescent material, that they would behave the same in a fire, or that a fire rating could carry from one to the other.  Plaintiffs therefore cannot meet their burden to show that the accused GPX 120 product—which, as far as the Court can discern from the evidence cited by the parties, has only received a fire rating in its fully assembled form—contains within it a layer of "fire rated glass" that is separate from the upper layer of structural glass, as required for claim 1 of the '475 patent and all of the dependent claims that Plaintiffs have asserted.[15]  *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995) ("To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly.").

---

[15] In response to some of Safti's other arguments for non-infringement—related, for example, to the presence or absence of load transferring means, the presence or absence of a gap between layers, and the transmission of load between layers—Plaintiffs contend that different products purportedly tested or advertised by Safti infringe the '475 patent even if the GPX 120 product does not infringe as sold, and that the doctrine of equivalents applies even if Safti did not literally infringe.  Plaintiffs present no such argument on the question of whether Safti's products contain a "fire rated" layer, and have identified no evidence from which the Court could conclude either that some other Safti product contains such a layer or that the layers of glass at issue are *equivalent* to a "fire rated" layer, or more generally that constructing a glass floor that includes any fire *resistant* layer is equivalent to one that includes a separately *rated* layer.

Safti's motion for summary judgment is GRANTED as to Plaintiffs' claims for patent infringement, and Plaintiffs' motion is DENIED as to those claims.  Safti's counterclaim for declaratory judgment of non-infringement is DISMISSED as redundant, as Safti's counsel agreed at the hearing.  The Court does not reach the parties' remaining arguments on infringement.

### C.    Motion for Leave to File Supplemental Brief

Several days after the hearing, Plaintiffs moved for leave to file a supplemental brief identifying further purportedly relevant evidence already in the record—evidence that Plaintiffs failed to identify as relevant to this issue in their three briefs regarding the motions for summary judgment or at the hearing.  *See* dkt. 213.  Much of the evidence Plaintiffs cite in their proposed supplemental brief is not relevant to whether the GPX 120 product contains a layer of fire rated glass that has received a fire rating separate from the GPX 120 product as a whole.[16]

Paragraphs 3 through 11 of the proposed supplemental brief address evidence that, Plaintiffs assert, informed MacFarlane's opinion that the lower portion of the GPX 120 satisfies the Court's construction of "fire rated glass."  Paragraph 3 cites evidence to indicate only that GPX 120 is fire rated as a whole, and upon scrutiny of the pages specifically cited, some of that evidence indicates that the layers at issue measure greater than two and a half inches thick.  The evidence cited in paragraph 4 describes the composition of the product, without addressing whether the lower portion is fire rated or consists of the fire rated SuperLite XLB product.  The evidence cited in paragraph 5 addresses Safti's manufacturing procedures, without addressing whether the lower portion of the GPX 120 product is fire rated.[17]  The evidence cited in paragraph

---

[16] The Court has not scrutinized every page of each exhibit—some of which consist of technical engineering documents running to well over one hundred pages—in an attempt to find any portion that might be relevant.  *See Keenan*, 91 F.3d at 1279 ("As other courts have noted, '[i]t is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.'" (citations omitted)).  The Court has reviewed each *page* of evidence specifically cited, as well as Plaintiffs' description of that evidence, and has found nothing that would carry Plaintiffs' burden to show that the GPX 120 product contains within it a distinct layer of "fire rated glass."

[17] Moreover, Exhibit T to Tim MacFarlane's report (cited in this paragraph) is not included with the copy of that report in evidence, which skips from Exhibit S to Exhibit U.  Based on the Bates numbers cited, that document may be the same as Exhibit 3 to the declaration of Donald McPhail submitted with Plaintiffs' opposition brief, but that exhibit does not indicate that the lower portion of the GPX 120 product is separately fire rated.

United States District Court
Northern District of California

6 "show[s] a glass unit that contains multiple sheets of tempered glass" and states that the unit as a whole "achieves a 120 minute rating," again without addressing whether the lower portion has received a rating on its own. Plaintiffs have never argued that a fire rating for the flooring system as a whole satisfies the requirement that the lower layer of the system is a "fire rated glass." The evidence cited in paragraph 7 purportedly shows that "the fire resistant layer is nominally 2-3/4" thick," which Plaintiffs assert is "substantially the same thickness as the SuperLite II-XLB of 2-½" thickness," but Plaintiffs cite no evidence indicating that the ¼" difference is insignificant and describes the same product. The evidence cited in paragraph 8 describes the manufacturing process for GPX 120 and indicates that as an intermediate stage of manufacturing, the full assembly measures 4.980" thick (although that measurement only appears on a page of the exhibit that Plaintiffs have not cited). Plaintiffs have not explained why that thickness for the full assembly would indicate that the lower portion consists of SuperLite XLB or otherwise has received a fire rating on its own. Paragraph 9 describes a step in constructing the GPX 120 glass assembly in which the structural layer and fire-resistant layer are pressed together to form a "nominal 5-3/16 in. (minimum 4.980 in.) thick assembly," but Plaintiffs do not explain why that supports a conclusion that the lower layer is separately rated. Paragraph 10 of the proposed supplemental brief cites paragraph 79 of MacFarlane's report, which is addressed above in the Court's analysis. As discussed above, the exhibit MacFarlane cites does not support his conclusory assertion that the product satisfies the Court's construction of "fire rated glass." As discussed here, the other exhibits Plaintiffs now cite also fail to support that conclusion. Paragraph 11 cites Safti's corporate representative's deposition testimony purportedly confirming that some of the documents discussed above accurately describe Safti's product. Not all of the pages cited in the proposed supplemental brief appear in the excerpt of that transcript included as the exhibit Plaintiffs cite. Regardless, none of the documents that the representative purportedly confirmed show that Safti's product contains a lower layer of "fire rated glass."

Paragraphs 11 and 12 of the proposed supplemental brief cite evidence of Safti's "marketing, advertising, and offering for sale of [its] GPX Fire Floor and certification of that product." That Safti marketed a fire rated GPX flooring system is not in dispute. Plaintiffs

United States District Court
Northern District of California

misrepresent some of these exhibits—Exhibits AA, BB, and CC to MacFarlane's report—as "stat[ing] the fire-rated floor product is composed of fire-rated glass combined with a tempered laminated walking surface." Those exhibits state that the assembly as a whole is fire rated, but they include no reference to the lower seven layers of the assembly being fire rated on their own.

Finally, paragraphs 14 through 16 cite evidence addressing "the different product that was offered for sale by [Safti] to the entity responsible for the Transbay Transit Center." Plaintiffs cite paragraphs 98 through 100 of MacFarlane's report, in which he expresses his understanding "that the [PTAB] determined that the 120 minute GPX FireFloor System described and depicted in the 2017 version of [Safti's] Fact Sheet . . . was offered for sale to the contractor responsible for the construction of the Transbay Transit Center . . . in or around March of 2015." Bautista MSJ Decl. Ex. 4 (MacFarlane Opening Report) ¶ 98; *see also id.* ¶ 99 (expressing MacFarlane's understanding that the version offered for sale for the Transbay project was "the same in all significant respects as the glass flooring system described and depicted in the 2017 Fact Sheet"). The exhibits cited in those paragraphs of MacFarlane's report—Exhibits Z, KK, and MM—are not included with the version of his report included in the record, although Exhibit Z, the 2017 fact sheet, appears separately as Exhibit 5 to attorney Philip Bautista's declaration. MacFarlane does not specifically address the "fire rated glass" limitation in this context, opining only "that the '120 minute GPX FireFloor System' 120 minute glass flooring system offered for sale in connection with the Transbay Transit Center project identically contains each and every element of claims, 1, 6, 7, 8, 12, 13, and 21 of the '475 patent," and infringes claim 11 under the doctrine of equivalents. *Id.* ¶ 100.

The PTAB's decision focused on the adjustment mechanism (in the parlance of this case, the "toggle") allegedly included in the product offered for sale to the Transbay project, not the layered glass assembly. *See* McPhail Opp'n Decl. Ex. 6 (Safti's notice of appeal, attaching the decision). The 2015 shop drawing on which the PTAB relied to determine what Safti offered to sell to the Transbay project is as follows:

United States District Court
Northern District of California



McPhail Opp'n Decl. Ex. 7 at OKI-003092.[18]  In contrast, the 2017 fact sheet cited by MacFarlane

includes the following diagram of the GPX 120 product, which accords with most other depictions

of that product in the record here:



Bautista MSJ Decl. Ex. 5.

With respect to the layered glass assembly, the products plainly are not the same.  The

2015 drawing depicts an assembly more than an inch thicker than that shown in the 2017 fact

sheet, and with more layers of material.  Plaintiffs acknowledge in their proposed supplemental

---

[18] There does not appear to be any evidence that this drawing, which differed from diagrams included in Safti's bid package, was ever shown to anyone associated with the Transbay project. The PTAB held that whether the buyer was aware of the nature of the product offered for sale was immaterial to whether the invention was offered for sale.  *See* McPhail Opp'n Decl. Ex. 6 at 34–35.

brief that the flooring system offered for the Transbay project was a "different product," Prop'd Supp'l Br. ¶ 14, contradicting MacFarlane's statement that it was "the same in all significant respects" to the GPX 120 product described in the 2017 fact sheet and in a UL testing report, *see* Bautista MSJ Decl. Ex. 4 (MacFarlane Opening Report) ¶ 99.  Since MacFarlane's opinion on the product offered for sale to the Transbay project rests solely on its purported identity with the 2017 fact sheet, it is not clear whether MacFarlane actually considered the "fire rated glass" layer of the product purportedly offered for sale.  Moreover, with respect to the "fire rated glass" limitation, MacFarlane's analysis of the "typical" GPX 120 configuration included in the 2017 fact sheet is conclusory and unsupported for the reasons discussed above.

Perhaps the best evidence Plaintiffs have now identified is the "120 MINUTE RATED SUPERLITE-XL-II" label included on the 2015 shop drawing, with an arrow appearing to designate the lower portion of the product.  But this is first addressed in Plaintiffs' proposed supplemental brief; there is no discussion of it in any pre-hearing briefing or, as far as the Court is aware, in any expert report, nor any evidence in the record that Safti ever obtained a fire rating for a product resembling that lower portion of the 2015 shop drawing.  It is not at all clear what significance could be drawn from that label standing alone, particularly when Plaintiffs have offered no evidence that the shop drawing in fact depicts the product that was offered for sale— aside from the PTAB's decision, which is currently on appeal.  *See MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373, 1376 (Fed. Cir. 2018) (holding that a decision of the PTAB that was appealed to the Federal Circuit only "became final" for the purpose of collateral estoppel when the Federal Circuit affirmed it).

Plaintiffs have been aware of their need to satisfy the "fire rated glass" limitation for some time.  The meaning of that term was disputed on claim construction, where the Court held in Safti's favor because Plaintiffs offered no argument or evidence supporting their preferred interpretation lacking any requirement for certification.  *See* Claim Construction Order at 14.  Safti contended that Plaintiffs could not meet that limitation in its motion for summary judgment and argued the point further in its opposition to Plaintiffs' motion and reply in support of its own.  Def.'s MSJ at 16–17 ("Notably, the GPX 120 has no 120-minute fire rating except as a unit.");

Def.'s Opp'n to MSJ at 2 ("The floor has no fire rating without the top layer . . . ."); Def.'s MSJ Reply at 5–6.  Plaintiffs have offered no explanation for their failure to raise the evidence they now cite in the briefing and argument already allowed, before the Court took the matter under submission at the hearing.

The newly cited evidence does not, for the reasons discussed above, change the outcome even if considered.  Moreover, Plaintiffs have no excuse for their failure to raise these arguments during the allowed briefing on these motions.  In any event, the proposed supplemental brief is too little, too late.  The motion for leave to file is DENIED.

### D.    Safti's Claim for Declaratory Judgment of Invalidity

Issued patents have a presumption of validity in infringement proceedings.  35 U.S.C. § 282.  The party asserting the invalidity of a patent bears the burden of proving invalidity by clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd.*, 131 S. Ct. 2238, 2242 (2011).  Clear and convincing evidence is such evidence that produces "an abiding conviction that the truth of [the] factual contentions are 'highly probable.'"  *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984); *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009).  Moreover, "where a party only relies on prior art considered by an examiner in its invalidity contentions, that party has the burden to 'overcom[e] the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and . . . whose duty it is to issue only valid patents.'"  *Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d 1175, 1179–80 (Fed. Cir. 2018) (quoting *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008)) (alterations in original).

Safti's expert Dr. Stevick states that "the 475 patent would have been obvious to a [person of ordinary skill in the art] and anticipated by prior art and presents no novel features."  Schickman MSJ Decl. Ex. 1 (Stevick Invalidity Report) ¶ 16.  Plaintiffs object to those conclusions on the basis that Dr. Stevick has disclaimed any knowledge of the applicable legal standards for obviousness and anticipation, and does not apply those standards in his reports, as well as for failing to understand and apply "basic canons of claim construction."  *See* Pls.' Mot. to

Exclude at 3–8.  The Court understands Dr. Stevick's reports as using the terms "obvious" and "anticipated" in their ordinary sense, not as legal terms of art, which he is of course entitled to do.  *See* Schickman MSJ Decl. Ex. 1 (Stevick Invalidity Report) ¶ 27 ("I am an engineer, not a lawyer, and do not express any opinion on legal issues.").  It is for the Court to determine whether the purported similarities between the '475 patent and the prior art addressed by Dr. Stevick satisfy those legal standards.  Similarly, for the purpose of claim construction, Dr. Stevick is an experienced engineer qualified to offer his opinion as to whether an I-beam serves as a means to transfer load.  The Court is capable of determining the appropriate weight to afford that opinion, taking into account canons of claim construction and the language of the patent.  Plaintiffs' motion to exclude Dr. Stevick's opinions regarding validity is DENIED.

"'[A] claim is *anticipated* if each and every limitation is found either expressly or inherently in a single prior art reference,'" with the elements of those limitations "'arranged or combined in the same way as in the claim.'"  *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 21 (Fed. Cir. 2012) (alteration in original; emphasis added; citations omitted).  The Federal Circuit has addressed the appropriate standard for *obviousness* as follows:

> A claimed invention is unpatentable "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious" to one of ordinary skill in the relevant art. 35 U.S.C. § 103. Obviousness is a legal question based on underlying factual determinations. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007); *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966); *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). Among the factual determinations are "the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any objective indicia of non-obviousness." *Randall*, 733 F.3d at 1362 (citing *KSR*, 550 U.S. at 406; *Graham*, 383 U.S. at 17–18). Also a fact question . . . is whether the relevant skilled artisan had a motivation to combine pieces of prior art in the way eventually claimed in the patent at issue. . . . "One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." [*KSR*, 550 U.S.] at 419–20.

*Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336, 1343–44 (Fed. Cir. 2017).

The first piece of prior art that Dr. Stevick identifies as anticipating or rendering obvious

33

the claims of the '475 patent is Figure 1 of the patent itself, which describes a known system of

suspending fire rated glass from the lower flanges of a structural I-beam and structural glass from

the upper flanges of the same beam, as follows:



'475 Patent Fig. 1.  According to Dr. Stevick, this figure is "identical" to claim 1 of the '475

patent, in large part because Dr. Stevick believes the I-beam depicted in Figure 1 constitutes a

"load transferring means."  Schickman MSJ Decl. Ex. 1 (Stevick Invalidity Report) ¶ 21.[19]

        As Plaintiffs' expert MacFarlane notes, the '475 patent's explicitly disclaims the presence

of any "load transferring means" in Figure 1 and instead describes the I-beam as part of the

"structural frame."  Bautista MSJ Decl. Ex. 27 (MacFarlane Rebuttal Report) ¶ 18; '475 Patent at

1:49–53 ("In the prior art double layer system *a load transferring means was not included* and

therefore one portion of the structural frame bore the load from the first layer of glass and a

separate portion of the structural frame supported the second layer of glass."); *see* '475 Patent at

1:13–16, 4:37–38 (identifying Figure 1 as showing the prior art double layer system).  The

specification states that the invention is preferable to the configuration in Figure 1 because, among

other reasons, the greater distance between layers that results from using an I-beam to separate

them is unsightly.  '475 Patent at 1:21–28.  Claim 1 of the patent also describes "a structural frame

comprising a plurality of beams and plurality of cross members interconnecting the beams" as

[19] Claim 24 of the '475 patent, which Dr. Stevick also asserts is invalidated by Figure 1, similarly requires a "load transferring means."

34

United States District Court
Northern District of California

distinct from the "load transferring means." '475 Patent at 8:44–46.  Dr. Stevick's closing invalidity report asserts that the I-beam depicted in Figure 1 would be distinct from a structural frame for the building as a whole, but does not address the express statements in the specification that Figure 1 depicts a form of prior art lacking a "load transferring means."  *See* Schickman MSJ Decl. Ex. 3 (Stevick Closing Invalidity Report) ¶¶ 17–28.

Where the specification of a patent reveals a "special definition" given by the inventor that differs from the meaning the term might otherwise possess, or "an intentional disclaimer, or disavowal, of claim scope by the inventor," "the inventor's lexicography governs."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005).  Reading the '475 patent as a whole, the term "load transferring means" as used therein cannot encompass the I-beam in Figure 1, even if the beam could accurately be described in another context as means for transferring load.  The specification disclaims such scope by explaining that the prior art based on an I-beam lacked a "load transferring means."  '475 Patent at 1:49–53.  Accordingly, in "the inventor's lexicography," *see Phillips*, 415 F.3d at 1316, a "load transferring means" must be something other than an I-beam.  Figure 1 therefore does not reveal an "identical" system to that claimed in the patent, contrary to Dr. Stevick's view.  *Cf.* Schickman MSJ Decl. Ex. 1 (Stevick Invalidity Report) ¶ 21.  Accordingly, Figure 1 does not render any claim of the '475 patent invalid as anticipated.

Whether the steps needed to go from Figure 1 to the claimed invention—using a distinct, non-I-beam, non-structural-frame load transferring means situated on top of a structural frame to separate the structural glass from the fire rated glass, rather than using existing flanges of an I-beam that is part of the structural frame—would be obvious to someone of ordinary skill in the art might be a closer question if presented as a matter of first impression.  Under the standard applicable here, however, Safti has not met its heavy burdens of both presenting clear and convincing evidence and overcoming the deference owed to patent examiners who were well aware of Figure 1 when they issued the patent containing it.  Safti cites no evidence except Dr. Stevick's report, which addresses only the similarities between the two configurations—more specifically, Dr. Stevick's legally erroneous view that they are identical.  *See* Def.'s MSJ at 17–19; Def.'s Opp'n to MSJ at 11–12; Def.'s MSJ Reply at 10–12.  Safti identifies no evidence

United States District Court
Northern District of California

addressing whether others had motivation to modify the prior art as the '475 patent does, or whether any other relevant indicia existed as to obviousness or non-obviousness.[20]  The fact that an I-beam making up a structural frame in the prior art served a similar role supporting separate layers glass to the load transferring means used to support separate layers of glass in the claimed invention is not clear and convincing evidence that the use of such a separate component on top of the structural frame to achieve a more visually appealing result would have been obvious to a person of ordinary skill in the art.

The other prior art at issue is French Patent No. 2,723,123 (the "'123 patent"), and specifically Figure 2 of that patent, as follows (taken here from Dr. Stevick's invalidity report):



Schickman MSJ Decl. Ex. 1 (Stevick Invalidity Report) ¶ 19.  Dr. Stevick asserts that this patent was "not discussed within the prosecution history," *id.* ¶ 18, but the '475 patent itself lists the French '123 patent (as well as an English language abstract of that patent) as among the documents considered by the patent office, *see* '475 Patent at p. 2.  "[W]hen prior art 'is listed on the face' of a patent, 'the examiner is presumed to have considered it.'"  *Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d 1175, 1179 (Fed. Cir. 2018) (quoting *Shire LLC v. Amneal*

---

[20] The Court does not rely on MacFarlane's opinion that the patented product achieved significant commercial success as an indication of non-obviousness.  Safti is likely correct that such an opinion falls outside of MacFarlane's expertise, but the Court need not reach that question because the opinion is not necessary to the conclusion that Safti has not met its evidentiary burden.

*Pharm., LLC*, 802 F.3d 1301, 1307 (Fed. Cir. 2015)).

Although Safti does not address this patent in its briefs, the Court addresses it in an abundance of caution, because Dr. Stevick offered an opinion that it invalidates the patent claims at issue and Plaintiffs addressed that opinion in their motion for summary judgment. *See* Pls.' MSJ at 20.

According to Dr. Stevick, Figure 2 of the French '123 patent describes the limitations of claim 1 of the '475 patent because it shows structural glass as item 12 (labeled near the top right), positioned above a fire rated glass layer as item 15 (labeled near the center right), a load transferring means in the form of "a load bearing steel glazing bead" as item 13 (labeled near the top left and circled in red), a vertical portion of the load transferring means in the form of the "L-shaped modular frame unit" as item 4 (labeled near the lower center), and a structural frame in the form of a cowling as item 18 (labeled near the bottom right) and "modulated frames" as items 1, 2, and 3 (which do not appear to be labeled in this diagram). *See* Schickman MSJ Decl. Ex. 1 (Stevick Invalidity Report) (table comparing prior art to claim limitations, included between the report and Appendix 1).[21]

In response, MacFarlane states a person of ordinary skill in the art would understand a "glazing bead" to generally describe something no more than one or two millimeters thick, which would be too thin to support the full load of a floor without transmitting some of that load to the fire rated glass below it, designated as item 14.  Bautista MSJ Decl. Ex. 27 (MacFarlane Rebuttal Report) ¶ 25.  MacFarlane also asserts that the screw that connects the glazing bead to the L-shaped beam is inserted through an oblong hole in the glazing bead in order to account for varying thickness of the fire rated glass below it, which would not provide vertical support for the glazing bead under load, since the oblong hole would allow it to slip downwards. *Id.* & Ex. 1. MacFarlane "note[s] that the same material (20) that is used between the structural glass (12) and the steel glazing bead (13) is also used between the steel glazing bead and the fire rated glass

---

[21] While Dr. Stevick addresses both independent claim 1 and independent claim 24 of the '475 patent as purportedly anticipated by Figure 1 of the '475 patent, he only addresses claim 1 as purportedly anticipated by the French patent.

below (14)," indicating that if that material can transmit load from the structural glass floor to glazing bead, it would also be sufficiently rigid to transmit load from the glazing bead to the fire rated glass, such that the load of the structural glass does not "bypass" the fire rated glass. *Id.* ¶ 26.

In his closing invalidity report, Dr. Stevick contends that the glazing bead labeled as 13 must support load because it is identified as being made of "load bearing steel" (a term that appears for the first time in his closing report; his initial report describes it only as "steel"), that MacFarlane places too much emphasis on the translated term "glazing bead," and that the material labeled as 20 would carry no load between the glazing bead and the fire rated glass because it is identified as type of a soft felt insulation. Schickman MSJ Dec. Ex. 3 (Stevick Closing Invalidity Report) ¶¶ 29–30. Dr. Stevick does not address MacFarlane's opinion that the material labeled as 20 must be capable of transmitting load because the same material is shown as supporting the structural glass floor above the glazing bead, or that the oblong hole for the screw attaching the glazing bead to the L-shaped beam would not support vertical load.

Ultimately, the Court is faced with two experts' conflicting interpretations of a patent that appears in the record only in French. *See* Bautista MSJ Decl. Ex. 28 (the '123 patent, in French). Safti has once again "failed to provide a translation of the French patent." *See* Claim Construction Order at 12 (noting this deficiency when Safti sought to rely on a different portion of the same patent for claim construction). With no way to review the patent's description of the invention claimed therein, the Court cannot say with any certainty which expert's view more closely aligns with it. That, combined with Dr. Stevick's failure to address meaningful points raised by MacFarlane as to the use of material 20 and the significance of the oblong screw hole, compels a conclusion that Safti cannot meet its heavy burden to show by clear and convincing evidence that the French '123 patent anticipates or renders obvious any claim of the '475 patent, and to overcome the deference owed to the patent examiners who also consider the French patent.

Plaintiffs' motion for summary judgment is GRANTED as to Safti's counterclaim for declaratory judgment of invalidity, and Safti's motion is DENIED as to that claim.

### E.  Whether Safti Offered a Product with Toggles for the Transbay Project

Safti seeks summary adjudication that it did present any product containing a "load transferring means" to the Transbay project, because it had not yet invented the toggle mechanism when it submitted its bid for that project.  Def.'s MSJ at 20–21.  Based on the Court's conclusion that Plaintiffs cannot show infringement of the '475 patent because there is no evidence that any Safti product contained a "fire rated glass" distinct from the flooring product as a whole, the issue of whether Safti offered a product with toggles is not relevant to any claim remaining in the case.  The Court therefore declines to reach that issue.

Safti does not otherwise seek summary judgment on Plaintiffs' claims regarding misrepresentations or interference.  To the extent those claims rest on representations of non-infringement or offering an infringing product, they fail based on the Court's conclusion that Safti is entitled to summary judgment on the issue of infringement.  To the extent that they rest on other representations or conduct, they may proceed.

### F.  Safti's Misrepresentation Counterclaims

#### 1.  Legal Standard for the Lanham Act

The Lanham Act prohibits in relevant part the use of "any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which— (A) is likely to cause confusion, or to cause mistake, or to deceive as to . . . origin . . . of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1).

The Supreme Court has articulated a two-part test for determining whether a plaintiff has standing under the Lanham Act to bring a false advertising claim.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–34 (2014).  First, the plaintiff's interests must fall within the "zone of interest" that Congress meant to protect under the Lanham Act.  *Id.* at 129–32.  The Court found that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales."  *Id.* at 131–32.  Second, the plaintiff "must show economic or reputational injury flowing directly from

39

the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133.

### 2. Legal Standard for the UCL

California's UCL broadly prohibits unlawful, unfair, and fraudulent business acts. *Kor. Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). "Unlawful acts are anything that can properly be called a business practice and that at the same time is forbidden by law . . . be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made, where court-made law is, for example a violation of a prior court order." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (ellipsis in original) (citations and internal quotation marks omitted). "Unfair acts among competitors means 'conduct that threatens an incipient violation of an antitrust law, or violates the spirit or policy of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" *Id.* at 1152 (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999)). "Finally, fraudulent acts are ones where members of the public are likely to be deceived." *Id.*

For a non-governmental plaintiff to bring a claim under the UCL, the plaintiff must have "suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.

### 3. Transbay Project

Greenlite and Safti both submitted designs for a large glass fire floor as part of the Transbay project in 2015. Bautista MSJ Decl. Ex. 14 (Dennett Decl.) ¶ 7; O'Keeffe Decl. ¶ 4. Greenlite was ultimately selected for the project. Safti contends that Greenlite won the project by misrepresenting its compliance with "Buy America" requirements.

Dennett states in his declaration that "Greenlite informed Crown Corr [the subcontractor responsible for the glass floor] of the possibility of supplying glass manufactured in Germany in an e-mail as early March 12, 2015," which he claims is attached to his declaration as Exhibit 2. Bautista MSJ Decl. Ex. 14 (Dennett Decl.) ¶ 8. Exhibit 2 is in fact a series of emails dated October 16 through October 27, 2015; the one relevant email in that exhibit is addressed further

40

1  below.  *See* Bautista MSJ Decl. Ex. 14 (Dennett Decl.) Ex. 3.

2  There is a separate set of emails from March of 2015 elsewhere in the record, in which

3  Dennett introduced a number of employees of Greenlite's glass supplier Vetrotech to the Transbay

4  project contractors in preparation for a meeting to consider Greenlite's proposal for flooring.

5  Schickman Opp'n Decl. Ex. 16.  Vetrotech's director of marketing and sales Kirk Ratzel replied

6  on March 12, 2015 to express concern about the project's "Buy America" criteria, stating that

7  Vetrotech could only produce glass conforming to the project specifications at its factory in

8  Germany, and that if American production was "a 'killer criteria' then we should know now, so as

9  not to waste your valuable time."  *Id.*

10  Dennett responded directly to Ratzel to explain that he had "already asked" and "[t]hey

11  will not allow production in Germany," and that he needed Vetrotech to produce the glass at its

12  factory in the United States.  Schickman Opp'n Decl. Ex. 12.  Ratzel reiterated that the glass could

13  not be produced in the United States for technical reasons, that he "was not exaggerating or

14  playing poker," and that "[i]f it's a deal killer, then no reason to have the meeting."  *Id.*  Dennett

15  responded only, "It's a deal killer."  *Id.*

16  Meanwhile, Jeff Heath, a senior project manager for the Webcor-Obayashi joint venture

17  leading the project, forwarded Ratzel's first email to other people involved with the project to ask

18  if there would be "a problem with Greenlite and Buy American," noting that Dennett had told him

19  Greenlite could meet the Buy America requirement.  Dennett Reply Decl. Ex. 1.  Erick del Angel,

20  an architect at the firm Adamson Associates, in turn forwarded Heath's email back to Dennett,

21  stating that he "found Mr. Ratzel's email to Webcor a bit concerning" and specifically

22  highlighting Ratzel's representation that "everything is made in Germany."  *Id.*  Dennett

23  responded to del Angel on March 13, 2015:

24  Erick,

25  Please ignore the email from Kirk. I had a talk with him. We may
26  have to make a portion of the fire-glass in VETROTECH Germany,
   but it will primarily be assembled and manufactured at VETROTECH
27  Auburn WA USA… The top glass floor portion is 100% USA and all
   the steel components will be 100% USA.

28  We also discussed with Jeff Heath and he said that would be ok.

1

            Ryan

2     *Id.*

3         Several months later on October 27, 2015, Dennett sent an email to Erick Bryant, an

4     employee of Crown Corr, as follows:

5             Also now that you have strong Buy America language in your terms
              and conditions, for both Crown Corr, Greenlite and Vetrotech's sake,
6             we need to *define "as defined by 49 U.S.C, Section 523 (j), 49 CFR*
              *Part 661, and 49 U.S.C. 24405".*
7
              As you know, and as we have been saying from the get-go: "the glass
8             **components** are fabricated in Germany and then **assembled** into
              frames in America, with American steel" . The VETROTECH Kinon
9             Factory in Germany is the only factory in the world to handle the fire-
              glass fabrication and capacity for this project.
10
              We have all had this discussion with Webcor, now I think we need
11            this in writing from the Transbay authority that our discussed plan to
              "assemble in America" is in fact acceptable.
12

13    Bautista MSJ Decl. Ex. 14 (Dennett Decl.) Ex. 2.  There is no evidence in the record as to whether

14    or how Bryant responded.

15        On December 14, 2015, Dennett sent a letter to Crown Corr and other parties responsible

16    for the Transbay Project in response to a request to verify "Buy America" compliance.  *Id.* ¶ 8 &

17    Ex. 3.  Dennett wrote that the "fire-rated glass and structural glass must be manufactured by

18    Vetrotech Saint-Gobain KINON facility in Aachen, Germany" because that was "the only factory

19    that can handle the complexity and capacity for the glass fabrication," but that the glass

20    components would be "assembled and glazed into frames" at Vetrotech's factory in Auburn,

21    Washington, and all other components of the flooring system would be manufactured in the

22    United States by US Steel.  *Id.*  After receiving that letter, Crown Corr and the other responsible

23    parties did not require Greenlite to supply glass manufactured in the United States.  *Id.* ¶ 9.

24        Dennett testified at his deposition that he was hoping to have at least some of the glass

25    manufactured in the United States, but tests results indicated it would not be possible, which he

26    "came to terms with" roughly within a week before sending the December 14, 2015 letter.

27    Bautista MSJ Decl. Ex. 15 (Dennett Dep.) at 163:11–165:8.

28        Other than Dennett's email to Erick del Angel, which is as self-serving as his testimony,

United States District Court
Northern District of California

United States District Court
Northern District of California

there is no documentary evidence to suggest that there was ever any likelihood that any of the glass could be produced in the United States.  The only documentary evidence from Vetrotech, Kirk Ratzel's emails, states that it could not.  That is not to say that Dennett's testimony is necessarily untruthful, but drawing all reasonable inferences in favor of Safti for the purpose of Plaintiffs' motion for summary judgment, a jury would not be required to credit any of Dennett's testimony, and might reasonably conclude that Ratzel's initial statement—that the glass would need to be produced in Germany—was both true and known to Dennett at all relevant times.  If that were the case, Dennett's March 2015 statement to del Angel that at least some of the structural glass would be produced in the United States, which Dennett purportedly also conveyed to Jeff Heath, would have been a misrepresentation as to the nature and origin of the glass intended to be used in the project.

While the evidentiary record as to the Transbay contractors' motivations in selecting a supplier is somewhat thin—neither party appears to have taken a deposition of anyone involved in that decision—there is evidence from which a jury could infer that Dennett's statement that some glass would be produced in the United States influenced the decision to select Greenlite over Safti as the glass flooring supplier.  Dennett only asserted that some glass would be made in the United States after Heath and del Angel both expressed concern about Ratzel's statement that it would need to be produced in Germany and how that would affect the project's "Buy America" compliance.  Dennett himself stated in a contemporaneous email that producing the glass in Germany would be a "job killer."  While Plaintiffs present some evidence indicating Safti was not chosen due to a higher price, a jury drawing all reasonable inferences in favor of Safti might conclude that if Greenlite failed to meet a "job killer" criteria, Safti would have been selected despite the higher price.  And while Greenlite was ultimately allowed to proceed with the project despite sourcing all of the glass from Germany after it revealed months later that it would need to do so, it is not clear that the parties involved with that decision would have shown the same flexibility had that been known at the time of initial selection.  The emails exchanged at that time suggest they would not have.

The Court is therefore satisfied that genuine issues of material fact remain to be resolved

for Safti's Lanham Act claim based on the Transbay project.  The same facts could also support a claim under the UCL, at least based on the "unlawful" prong and Greenlite's purported violation if the Lanham Act, and perhaps also based on a violation of the Buy America Act or the "unfair" prong.  Safti has standing under that statute because a jury could reasonably conclude that it "lost money or property" as a result of not being selected for the project.  Plaintiffs' motion is therefore DENIED as to Safti's Lanham Act and UCL counterclaims to the extent they are based on misrepresentations regarding where glass would be produced for the Transbay project.

### 4.     20 Washington Project

The 20 Washington project concerned construction of a building in Princeton, New Jersey. Bautista MSJ Decl. Ex. 14 (Dennett Decl.) ¶ 10.  On September 24, 2015, Dennett sent an email to Mark Jaffar, an associate at KPMB Architects, indicating that a subcontractor had awarded flooring work to Safti and was in the process of reviewing Safti's shop drawings for approval. Bautista MSJ Decl. Ex. 22 (Jaffar Decl.) ¶ 2 & Ex. 1.  Dennett's email included the following warning:

> SaftiFirst have been trying to copy our Glass Floor system for a while now. We have not seen their details yet because they are trying to be sneaky. They have not done a project yet so again for this reason we have not seen their details. *But I have to point out that if the Safti details look anything like our details they will be in US patent violation.*
>
> More importantly for you [sic] sake is to make sure they have a tested and listed system. From what I can find on UL and Intertek directories Safti *do not* have a listing or a fire-test for a horizontal glass floor.

*Id.*  Jaffar responded later the same day as follows:

> Sorry I missed your call. Thanks very much for the e-mail with the information on SaftiFirst's floor system. We did receive the shop drawings and have rejected them based on the details not matching what was shown in our Architectural drawings.
>
> We will follow up with the Construction Manager to find out the history of this and to impress on them that we need a system that is detailed as the Architectural documents show and that is a tested, rated assembly. Based on your e-mail below, it seems like SaftiFirst DOES NOT have a tested assembly.
>
> Not sure where this will end up, but if we have any questions we will be in touch…

44

United States District Court
Northern District of California

*Id.* (ellipsis in original).

Dennett testified at his deposition that he believed Safti was being "sneaky" by "going to great lengths . . . for us not to see their details maybe because they thought they may be in patent infringement." Bautista Decl. Ex. 15 (Dennett Dep.) at 72:6–9. He testified that he believed Safti did not have a "listing or a fire-test for a horizontal glass floor" at the time of his email because he "couldn't find any on the . . . testing agency's database." *Id.* at 74:15–19. Greenlite was ultimately awarded the flooring contract for the 20 Washington project. *Id.* at 75:16–21.

Safti had in fact received a 60-minute fire rating for a floor from Intertek based on tests performed on June 26, 2015, where the floor failed after 81 minutes and thus failed to receive a 120-minute rating. Schickman MSJ Decl. Ex. 2 (Stevick Reply Report) ¶ 35. Safti received additional certifications years later, after modifying its products. *Id.* ¶¶ 36–37

"Statements of opinion are not generally actionable under the Lanham Act," including opinions of a layperson on issues of law. *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). Dennett's statements that Safti was being "sneaky," and that "*if* the Safti details look anything like our details they will be in US patent violation," are statements of opinion, not fact, particularly taking into account the conditional nature of Dennett's comment on patent infringement and the fact that he disclaimed any knowledge of the details of Safti's floor. As for the fire rating, Dennett stated only that he was unable to find evidence of a listing on UL and Intertek's websites. Safti has identified no evidence that such a listing was in fact available on those websites at that time, nor addressed whether Dennett's statement would be sufficiently misleading to support a claim even if technically accurate.

The Court therefore concludes that no reasonable finder of fact could find that Safti met its burden under the Lanham Act to prove a false or misleading representation with respect to the 20 Washington project. Safti also has not explained how these statements would support a claim under the UCL if not through a Lanham Act violation. Plaintiffs' motion is GRANTED as to those counterclaims to the extent they rest on the 20 Washington project. The Court does not reach the question of whether a finder of fact could infer a causal relationship between Dennett's statements and Safti's removal from the project.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 5. Other Projects

Safti cites purported misrepresentations related to the Willis Tower project in Chicago, but does not address Plaintiffs' argument that Safti has shown no evidence of damages related to that project. *See* Def.'s Opp'n to MSJ at 17. There is no evidence contradicting an email offered by Plaintiffs from a project engineer on that project stating that "[t]he owners decided not to go with a structural glass floor" because "[t]hey didn't want to deal with the city and codes etc, and found a metal project they want to use instead." Dennett Reply Decl. Ex. 2.

Safti also contends that Greenlite misrepresented its Buy America compliance with respect to the project at Union Square, a project from which Greenlite was ultimately removed when the general contractor replaced the subcontractor that had hired Greenlite. Def.'s Opp'n to MSJ at 15–16. Safti does not explain how those representations harmed Safti. *See id.*

Safti cites only the Transbay project and the 20 Washington project as jobs that it purportedly lost on account of alleged misrepresentations by Greenlite. *Id.* at 18–19. In a November 18, 2020 email, Safti's counsel "confirm[ed] that 20 Washington and Transbay are the two specific projects which we claim were lost because of plaintiffs' conduct under the Lanham Act . . . and under any other theory properly available under Rule 15." Bautista MSJ Decl. Ex. 19. Safti has identified no evidence that the representations at issue for any other projects damaged Safti in any way. Safti therefore has not met its burden to show that a reasonable finder of fact could determine that it suffered either "economic or reputational injury flowing directly from the deception," as would be necessary for its Lanham Act counterclaim, or "injury in fact" such that Safti "lost money or property," as would be necessary for its UCL counterclaim. Plaintiffs' motion for summary judgment is GRANTED as to those claims with respect to all projects other than the Transbay project.

### 6. Representations on Greenlite's Website

Safti also cites representations on Greenlite's website in support of its Lanham Act and UCL claims. Dennett testified that a reference to "50 plus professionals" on Greenlite's website included third-party independent contractors whom Greenlite worked with on a project-by-project basis, not only Greenlite employees. Bautista Decl. MSJ Ex. 23 (Dennett 30(b)(6) Dep.) at

46

158:19–161:3.  He testified that a reference to "100 plus competed projects" referred to all projects with the Liteflam flooring system, including not only projects by Greenlite but also projects that inventor Michael Rae completed internationally and projects that an earlier company Dennett was involved with that had licensed the '475 patent from Ely Holdings had completed, and that the number was not limited to fire rated floors.  *Id.* at 155:20–157:20.  Dennett testified that Greenlite had only completed around ten projects installing 120-minute fire rated floors.  *Id.* at 157:24–158:9.[22]

Safti has identified no evidence that any customer ever saw or relied on these representations, or that Safti was harmed by them.  Safti also has not identified any evidence of the nature of the website except for descriptions in the excerpts of Dennett's deposition—the web page itself does not appear to be in evidence.  There is no evidence from which a finder of fact could determine whether the representations are actually misleading in context or if Dennett's explanations of them are consistent with how a viewer of the website would naturally interpret them, or whether Safti was damaged by the representations in any way.  Plaintiffs' motion for summary judgment is GRANTED as to Safti's claims based on the website representations.

### G.    Safti's Unfiled Counterclaims Regarding Interference

Safti includes a section of its opposition brief defending claims for interference with contract and economic advantage that it has not asserted in any pleading.  *See* Fed. R. Civ. P. 7(a) (defining the "pleadings" allowed in civil litigation in federal court).  Def.'s Opp'n to MSJ at 20–23 & n.8.  Safti asserts that it "has advised Greenlite that, based on the discovery in this case, it intends to move for leave to amend its pleading to assert intentional interference with contract and prospective advantage, based on the same set of operative facts underlying its unfair competition claims," citing a November 18, 2020 email between counsel.  *Id.* at 20 n.8 (citing Bautista MSJ Decl. Ex. 19).  But Safti has not filed a motion for leave to amend, and such claims are not before

---

[22] Safti also asserts that Greenlite falsely advertised selling "the only floor available in North America," but cites no evidence for that except pages of Dennett's deposition transcript that are not included in the record before the Court.  Def.'s Opp'n to MSJ at 16.  To the extent Safti bases its claims on that purported misrepresentation, Plaintiffs are entitled to summary judgment because there is no evidence in the record that Greenlite actually made such a representation.

the Court at this time. "The Ninth Circuit has recognized that 'a party may not circumvent Rule 8's pleading requirements by asserting a new allegation in response to a motion for summary judgment.'" *Siltronic Corp. v. Employers Ins. Co. of Wausau*, No. 3:11-CV-1493-YY, 2018 WL 415928, at \*4 (D. Or. Jan. 2, 2018) (quoting *Ward v. Clark County*, 285 F. App'x 412, 412 (9th Cir. 2008), and citing *Wasco Prods., Inc. v. Southwall Techns., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006)), *recommendation adopted*, 2018 WL 1560083 (D. Or. Mar. 29, 2018). The Court declines to address those potential claims, and does not decide whether Safti would be entitled to leave to amend if it were to file such a motion at this late date, well after the close of discovery and the deadline for filing dispositive motions.

## IV.    CONCLUSION

For the reasons discussed above, Safti's motion for summary judgment is GRANTED as to Plaintiffs' infringement claims, DENIED as to Safti's invalidity counterclaim, and DENIED AS MOOT as to whether Safti offered a product with toggles for sale to the Transbay project. Plaintiffs' motion for summary judgment is GRANTED as to Safti's invalidity counterclaim and DENIED as to Plaintiffs' infringement claims. With respect to Safti's counterclaims under the Lanham Act and UCL, Plaintiffs' motion is DENIED to the extent that those claims rest on representations regarding the source of glass for the Transbay project, but GRANTED to the extent they are based on any other representations or conduct. Safti's counterclaim for declaratory judgment of noninfringement is DISMISSED as redundant to the infringement claims on which Safti prevailed. Plaintiffs' motion for leave to file a supplemental brief is DENIED.

Plaintiffs may proceed to trial only on their Lanham Act, UCL, intentional interference, and negligent interference claims, except to the extent those claims are based on allegations that Safti infringed the '475 patent. Safti may proceed to trial only on its Lanham Act and UCL claims, and only to the extent those claims are based on Greenlite's representations regarding the source of glass for the Transbay project.

**IT IS SO ORDERED.**

Dated: February 3, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge